RAMÓN FERNÁNDEZ y OTROS, demandantes y recurrentes, *v.* HOSPITAL GENERAL SAN CARLOS, INC. y OTROS, demandados y recurridos.

*Número:* R-81-334 *Resuelto:* 3 de febrero de 1983

*Wilfredo A. Géigel,* abogado de los recurrentes; *Ángel R. De Corral Juliá,* de *Miranda Cárdenas, De Corral & Rodríguez Surís,* abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR DÍAZ CRUZ emitió la opinión del Tribunal.

El médico interno a cargo de la sala de emergencia del Hospital San Carlos examinó a un niño de 6 años que le fue llevado entre 4:00 y 5:00 de la madrugada del 29 marzo, 1973 y diagnosticó infección de la garganta y vómitos. De regreso al hogar se agravó su condición, fue visto por su pediatra en la mañana y luego por otros especialistas en el Hospital Matilde Brenes al que fue admitido y murió a las 7:40 en la noche del mismo día, de causa determinada como meningitis en una autopsia cuyo informe está fuertemente cuestionado por perito que con fundamento la interpreta como concluyente de que la muerte se debió a coma diabético. La juez de instancia, con la autoridad de su arbitrio estimativo, consignó los hechos probados durante cuatro días de juicio en precisas determinaciones que es necesario transcribir para no perder ni un detalle conducente a la ausencia de responsabilidad en el médico y en el hospital demandados, en el lamentable deceso. Dicen:

### Determinaciones de Hecho

1. Stephen David Fernández White era hijo de los demandantes Ramón Fernández y Madeline White y tenía, para el día 29 de marzo de 1973, seis años de edad.

2. El día 26 de marzo de 1973, el menor Fernández White fue llevado al Hospital Regional de Bayamón para recibir tratamiento por un dolor de oídos. Como consecuencia del dolor de oídos, la señora Fernández no mandó a su hijo a la escuela al próximo día.

3. El día [28] de marzo el niño fue enviado para su casa antes de finalizar la escuela porque no se estaba sintiendo bien. Al hablar ella con su hijo como a las 6:30 de la tarde, éste se le quejó de dolor de cabeza pero no tenía fiebre. El menor comió bien esa noche y se acostó sin quejas.

4. Como a las 2:00 de la mañana del día 29 de marzo, Ste-

phen se levantó ardiendo en fiebre, lo que motivó que ella y su esposo lo llevaran a la Sala de Emergencia del Hospital San Carlos, llegando al Hospital entre las 4:00 y la[s] 5:00 de la madrugada.

5. Al llegar al Hospital el menor Fernández White entró caminando por sus propios pies a la Sala de Emergencia y fue recibido por la enfermera graduada, Margarita Jaca, quien le llenó el formulario de información del paciente y procedió a llamar al doctor Carlos Moyka, médico de guardia, para que viniera a examinar al menor.

6. La señora Fernández le indicó a la enfermera Jaca y al doctor Moyka, al preguntarle éstos qué era lo que le pasaba al niño, que su hijo había estado bien hasta ese día cuando se despertó con vómitos, fiebre y tos como a las 12:00 de esa noche.

7. El doctor Moyka le indicó a la enfermera Jaca que le pasara al paciente a la salita de exámenes para hacerle un reconocimiento físico. El niño caminó desde la sala de espera hasta la salita de exámenes y se subió en la mesa de exámenes sin ayuda, por indicaciones del doctor Moyka.

8. El doctor Moyka procedió a hacerle al paciente un examen general completo, inclu[so] prueba para rigidez de nuca, arrojando dicho examen resultados completamente negativos con la excepción de que dicho paciente mostraba la garganta enrojecida.

9. Por la descripción de los vómitos que hizo la señora Fernández, a solicitud del doctor Moyka, éste determinó que los mismos eran de tipo alimenticio.

10. En base al examen practicado al paciente, a la sintomatología que éste presentaba, y al historial obtenido de la madre de éste, el doctor Moyka hizo un diagnóstico de faringitis o infección de la garganta y vómitos, y procedió a administrarle a éste, por la vía oral, el antibiótico "eriteromycin" [sic], "tylenol" para la fiebre y una inyección de "tigan" intramuscular para los vómitos.

11. La temperatura rectal del niño al ser examinado por el doctor Moyka era de 39 grados centígrados, su pulso era de 90 por minuto y su respiración de 22 por minuto. Todos estos signos vitales, con excepción de la temperatura que era algo elevada, están dentro de los límites normales para un paciente de la edad de Stephen.

12. El aspecto general del niño mientras estuvo en Sala de Emergencia era bueno y éste no se veía agudamente enfermo.

13. Después de haber dado tratamiento de emergencia al paciente, el doctor Moyka le indicó a los padres de éste que se lo llevaran para su casa, lo observaran y que, de no mejorar, lo trajeran nuevamente al Hospital San Carlos.

14. Toda vez que Stephen seguía enfermo, la señora Fernández llamó al pediatra de éste, Dr. Vázquez Casanova, y lo llevó a su oficina para ser examinado nuevamente entre 9:00 y 9:30 de la mañana de ese mismo día. El doctor Vázquez Casanova refirió al niño para admisión al Hospital Matilde Brenes por "vómitos".

15. El menor Fernández White fue llevado a la Sala de Emergencia del Hospital Matilde Brenes entre las 10:00 y las 10:30 de la mañana en donde fue examinado por el doctor Abreu y admitido al Hospital bajo los servicios de la Dra. Concepción Quiñones de Longo, pediatra con privilegios en el Hospital que fue asignada al caso.

16. La doctora Quiñones de Longo examinó al menor Fernández White entre las 4:00 y las 4:30 de la tarde del 29 de marzo, encontrándolo en estado de coma.

17. Luego del examen la doctora Quiñones de Longo hizo un diagnóstico de acidosis diabética y señaló debía descartarse la posibilidad de una meningitis. Nos llama la atención del récord del Hospital Matilde Brenes, sin embargo, que la gran mayoría de las órdenes para el tratamiento del paciente dadas por la doctora Quiñones de Longo, van dirigidas a tratar la condición de acidosis diabética y no a descartar la posibilidad de una meningitis en este paciente. Nótese que no es hasta la[s] 7:30 de la noche, aproximadamente, que la Dra. Quiñones de Longo se decide a llevar a cabo una punción lumbar para confirmar definitivamente la existencia o no de la condición de meningitis y que es mientras está preparándose a Stephen para este proceso, a las 7:40 de esa noche, que éste fallece.

18. Aun cuando el doctor Néstor Loynaz, patólogo forense, en su certificado de autopsia indica que la causa de la muerte del menor Fernández White fue una meningitis purulenta entendemos que, aun dicho diagnóstico patológico fue puesto en tela de juicio por el testimonio robusto y convincente prestado a esos efectos por la Dra. Rosa Fiol, perito de la parte demandada. La doctora Fiol, después de examinar los records

completos del paciente, así como también las laminillas de tejidos preparadas por el doctor Loynaz en la autopsia de Stephen, concluye que no puede afirmarse, de forma categórica que este paciente falleciera de meningitis purulenta por haber muy poco pus en las meninges. Afirmó, además, la doctora Fiol que, en base al cuadro completo que presentaba este paciente, no podía descartarse que hubiere fallecido de un coma diabético.

19. Con relación a la contención principal de los demandantes de que el doctor Carlos Moyka ha debido descartar o confirmar el diagnóstico de meningitis en este caso, y, una vez confirmado dicho diagnóstico, tratar la referida condición, ello depende, según el testimonio de todos los peritos que declararon en el juicio, de la sintomatología que presentara el paciente al momento de ser examinado por el doctor Moyka. Prueba clara de ello es el testimonio vertido en el caso por el doctor Eduardo Mirabal Font, especialista en neurología pediátrica, quien manifestó que si los síntomas que presentaba el paciente al momento del examen eran fiebre y vómitos desde las 12:00 de esa noche, y no se indica en el historial tomado que hubiere tenido dolor de cabeza ni dolor de oídos que requirió tratamiento dos días antes, ni que tuvo que faltar a la escuela por dicha condición, y se hace un examen general del paciente, inclu[so] una prueba negativa para rigidez de nuca, él tampoco habría sospechado que el niño pudiera estar padeciendo de meningitis.

20. Aun cuando, en la opinión de los peritos de la parte demandante, no constituye la mejor práctica que los internos hagan guardia sin supervisión directa en las Salas de Emergencia del país concluimos que, para la fecha de estos hechos, ello constituía la práctica generalizada en los hospitales del país. Si consideramos, además, que el Hospital San Carlos era un hospital pequeño y tenía poco tráfico en su Sala de Emergencia, debemos concluir igualmente que no constituyó negligencia "per se" el que el doctor Moyka hiciera su guardia solo el día 29 de marzo de 1973. Entendemos, además, que este hecho no tuvo relación causal alguna con el fallecimiento de Stephen. Evidencia clara de ello lo es el que ninguno de los restantes médicos que atendieron al paciente, entre los que se incluyen su pediatra regular, un médico con licencia y experiencia en el manejo de Sala de Emergencia, y la pediatra asignada al caso, ni hace un diagnóstico definitivo de menin-

gitis, ni trata dicha condición. Y esto a pesar de que intervinieron en el caso cuando dicha enfermedad estaba más avanzada lo que, en opinión de los peritos, debía hacer más claros los síntomas que cuando fue atendido, entre las 4:00 y las 5:00 de la mañana, por el doctor Moyka. Los síntomas más comunes de la meningitis son la fiebre alta, el dolor de cabeza, los vómitos de tipo proyectil y la existencia de rigidez nucal. Sólo existía en este caso uno de dichos síntomas, a saber: la fiebre y aún ésta no era lo que podemos considerar alta, pues el paciente tenía 39 grados centígrados de temperatura rectal. Los vómitos que había tenido el paciente fueron descritos por la madre de éste, a preguntas del doctor Moyka, como de tipo alimenticio y no proyectil, por lo que no fueron considerados importantes. Ante este cuadro, es la opinión de todos los peritos que declararon en el juicio, que no hubieran sospechado que el paciente padeciera de meningitis.

21. Los médicos que están haciendo su internado y su residencia tiende[n] a ser mucho más inquisitivos y más dados a consultar, y tienden a llevar a cabo exámenes más minuciosos de los pacientes que los médicos de mucha experiencia, precisamente porque están [sic] conscientes de sus limitaciones en cuanto a conocimientos y experiencia en la práctica de la medicina. Por ello concluimos que no fue un factor causativo de la muerte del menor Stephen David Fernández White el hecho de que hubiere sido el doctor Moyka, un interno de poca experiencia, el que hubiere examinado y prestado a éste tratamiento el día 29 de marzo de 1973. ¿Por qué hemos de exigir más conocimientos y habilidad diagnóstica del interno que de dos pediatras y un médico generalista con experiencia en Sala de Emergencia que tampoco diagnosticaron definitivamente ni trataron la meningitis que se alega causó la muerte del menor?

22. Los doctores Juan F. Jiménez y Rosendo Vela y la doctora Rosa Fiol, cuyos testimonios periciales nos merecieron entero crédito, declararon que, en su opinión, después de haber revisado todos los récords de donde surgía el tratamiento recibido por este paciente, dicho tratamiento estaba a tono con las normas generalmente reconocidas para la práctica de la medicina, específicamente en lo que concierne al cuidado de Sala de Emergencia y que ellos tampoco hubieran sospechado la existencia de la meningitis en dicho

paciente ante el cuadro que éste presentaba la madrugada del 29 de marzo de 1973.

 Que los internos hagan guardia sin supervisión directa en las salas de emergencia, no es práctica ideal pero era una impuesta por necesidad y aprobada por Reglamento de Salud, 24 R.&R.P.R. sec. 18–221, para el año 1973 en que ocurrieron los hechos. Mas no puede imputarse negligencia a un médico por su sola condición de interno, y menos en este caso específico en el que *todos* los peritos médicos declararon en el juicio que de confrontarse con el cuadro de síntomas y datos a que atendió el interno doctor Moyka, tampoco hubiesen sospechado de meningitis. No puede llegarse al diagnóstico correcto de una condición si no se tiene razón alguna para sospechar su existencia. A. R. Holder, *Medical Malpractice Law*, John Wiley & Sons, Inc., 1975, pág. 65. Mal puede culparse al médico demandado de negligencia al no promover una encuesta de datos más allá de los suplidos por el paciente, y su propia señora madre, y de los síntomas a la vista, ninguno de cuyos factores ni remotamente insinuaban meningitis, si el mismo pediatra del niño que lo vio cinco horas después en la mañana con síntomas más afirmados, tampoco sospechó que fuera caso de meningitis, y si aun posteriormente otro médico pediatra en el Hospital Matilde Brenes diagnosticó shock diabético. Hay que destacar que el pediatra del niño y los médicos del Hospital Matilde Brenes, a pesar de que reciben al niño paciente cinco o seis horas después con síntomas agravados, de mayor relieve y significado para el diagnóstico acucioso que los observados por el médico de emergencia en la madrugada, estuvieron como éste limitados por los recursos de su ciencia y no percibieron indicio que acusara la infección fatal. (Determinaciones de Hechos, núm. 17 y ss.) Ya pasamos sobre una situación casi idéntica en *Rosado Rosado* v. *E.L.A.*, 108 D.P.R. 789 (1979), en el que revocamos per curiam la sentencia estimatoria de la demanda porque la prueba demostró "que en ocasión de ambas visitas de la

paciente al médico, éste tuvo ante sí un cuadro de síntomas que —a base del historial de la paciente— razonablemente justificaba un primer diagnóstico de una condición de origen viral como pueden serlo la influenza y la 'enteritis' ". Pág. 794. (La paciente allí, una niñita de 6 1/2 años, murió al día siguiente de causa que la autopsia reveló como fallo cardíaco respiratorio debido a bronconeumonía aguda.) Dijimos que "[d]el testimonio pericial se desprende que no estamos ante el caso donde los síntomas de la infortunada paciente presentaran la probabilidad de un diagnóstico original de pulmonía o bronconeumonía . . . [q]ue las intervenciones del médico codemandado con la paciente transcurren en un período de tiempo que no alcanza las 24 horas y que la condición de la paciente en la *segunda* visita al médico codemandado tampoco ofrecía el cuadro de síntomas que usualmente conduce a un diagnóstico de pulmonía o bronconeumonía, tenemos que concluir que la atención brindada por el médico a la paciente durante esas pocas horas en que se mantuvo vigente el diagnóstico razonablemente justificado a base del cuadro clínico presente, exhibe aquel grado de cuidado razonable que llena las exigencias de la profesión médica. El médico codemandado realizó un esfuerzo honesto y concienzudo —durante el período de tiempo de poco menos de 24 horas en que se mantuvo operante el diagnóstico original— para enterarse de los síntomas y la condición de la paciente". Págs. 794-795. (Énfasis nuestro.)

La base para aplicar este razonamiento al caso que ahora nos ocupa se amplía considerando que el único médico aquí demandado([1]) vio al niño paciente *una sola vez* durante 10 ó 15 minutos, y que fueron los especialistas a quienes fue llevado en el curso del día los que pudieron observar mayor definición en los síntomas y que tampoco

---

([1]) La demanda original incluía como demandados a los médicos de Matilde Brenes, pero los demandantes desistieron de su acción contra éstos.

deben ser culpados por no percibir la verdadera naturaleza del mal, por no sospechar su presencia. No obstante, su refinamiento profesional, y en el caso del pediatra del niño, su caudal de información y compenetración con la salud de éste, incurrieron en el mismo sano error de juicio o diagnóstico equivocado del interno doctor Moyka. No fue menos la intervención de todos ellos que la del médico en *Rosado Rosado*, supra, pág. 795, que calificamos como "esfuerzo honesto y concienzudo".

 Con firme reiteración del principio de que el error de buena fe del médico o el atribuible a las limitaciones de la ciencia revelada, excluyen responsabilidad por negligencia, continuó expresándose este Tribunal (en notable y anticipada analogía al caso de autos) a las págs. 795–796 de *Rosado Rosado*, supra:

> [Del] hecho que el cuadro clínico observado por el médico durante un período de tiempo que no alcanzó 24 horas no constituía el cuadro de síntomas que de ordinario conduce a un diagnóstico de pulmonía o bronconeumonía, forzoso es concluir que no se justifica la imposición de responsabilidad por impericia profesional a base de que el médico omitiera ordenar una serie de pruebas de laboratorio para descartar un diagnóstico que era compatible con el cuadro de síntomas que presentaba la paciente en ocasión de ambas visitas al Dr. De la Cruz.
>
> El caso de autos ejemplifica la circunstancia de un diagnóstico equivocado dentro de un contexto en que ha operado aquel criterio de razonabilidad que libera de responsabilidad por impericia profesional a un médico que en el cumplimiento de su deber, hace un esfuerzo honesto y concienzudo para enterarse de los síntomas y condición del paciente. *Morales* v. *Hosp. Matilde Brenes*, 102 D.P.R. 188, 194 (1974).
>
> En presencia de testimonio pericial a los efectos de que el tratamiento ordenado por el médico a tenor con los síntomas que presentaba la paciente es aceptable dentro de la práctica de excelencia de la medicina, no encontramos justificada la imposición al médico de responsabilidad por impericia profesional a base de que no se ordenaran exámenes de laboratorio

durante el transcurso de las breves horas en que quedan comprendidas ambas visitas de la paciente al médico codemandado. Los síntomas presentes en la segunda visita de la paciente, a la mañana siguiente de haberse hecho el diagnóstico preliminar, no hacían sospechar una condición pulmonar que habría de desembocar, pocas horas más tarde, en el deceso de la infortunada menor.

Ante esta situación de hecho y de Derecho no puede imputarse malapráctica al doctor Moyka porque no ordenara unos exámenes de laboratorio, ni que emprendiera diagnósticos diferenciales para eliminar una meningitis insospechada, de ningún indicio en los síntomas ni en el historial informado a él ni en el resultado del examen físico completo *que incluyó la prueba para rigidez de la nuca* con resultado negativo. (Determinaciones de Hechos, núm. 8.)

La opinión disidente es imaginativa al buscar apoyo en inferencias sobre el curso normal de los acontecimientos humanos. Infiere lo contrario a lo probado. Prefiere creer que el niño fue llevado en brazos de su padre a la camilla de exámenes, cuando hay prueba de que circulaba sin dificultad y la propia madre declaró que el pequeño paciente subió sin ayuda a la mesa de examen. Descarta los hechos probados según lo determinó la juzgadora en instancia para concluir en revisión que la señora madre del niño dio al médico demandado más información de historial que la recogida en las determinaciones y que, por tanto, el médico tenía ante sí un cuadro sospechoso de meningitis que también evadió a los especialistas que vieron al paciente posteriormente, a pesar de que conocieran más historial que el brindado en la sala de emergencia.

La Ley, y no el corazón del juez, es quien decide en nuestro sistema de Derecho.

Con estos antecedentes y fundamentos, *la sentencia revisada que absolvió al médico y al hospital, será confirmada.*

El Juez Asociado Señor Negrón García emitió opinión

disidente a la que se unen el Juez Presidente Señor Trías Monge y el Juez Asociado Señor Irizarry Yunqué.

—O—

Opinión disidente del Juez Asociado Señor Negrón García, a la cual se unen el Juez Presidente Señor Trías Monge y el Juez Asociado Señor Irizarry Yunqué.

Nuestra función revisora nos obliga a disentir en el presente caso, después de un análisis sistemático, meticuloso y crítico de la prueba desfilada. Detectamos que las determinaciones fácticas del estrado de instancia —presuntivamente correctas— no responden, por desgracia, a la finalidad óptima de un proceso judicial: *la verdad.* Injustificadamente descartan los siguientes indicadores positivos demostrativos de una práctica negligente de la medicina: (1) el resultado de un protocolo de autopsia corroborativo, sin dudas, de una muerte por meningitis; (2) la dinámica y existencia de signos físicos visibles ostensibles y presentes desde el primer momento, compatibles con esa grave enfermedad; (3) el conocimiento de los mismos por el médico; (4) la realización de un examen físico superficial, incompleto y apresurado (de alrededor de diez minutos de duración); (5) no ordenar exámenes rutinarios de laboratorio sencillos y económicos; (6) pasar por alto diagnósticos diferenciales recomendados sin explorarlos; (7) dar de alta prematuramente; y (8) la realidad de la enfermedad de meningitis diagnosticada pocas horas después, causante de la muerte.

Sin quererlo, el inventario jurídico neto no sólo perpetúa una injusticia, fundada básicamente en un precedente inaplicable, (1) sino que convalida unas normas laxas para

---

(1) *Rosado Rosado* v. *E.L.A.*, 108 D.P.R. 789 (1979), se distingue porque allí: "ni los síntomas ni el historial del paciente apuntaban originalmente hacia un diagnóstico de pulmonía o bronconeumonía" (pág. 794); y "tampoco ofrecía el cuadro de síntomas que usualmente conduce a un diagnóstico de pulmonía o bronconeumonía" (pág. 795).

Como veremos, en el caso de autos todos los peritos testificaron —a base de los

las salas de emergencia de los hospitales del país, que en lugar de estimular la excelencia en la práctica de la medicina, la empobrece. *Cruz* v. *Centro Médico de P.R.*, 113 D.P.R. 719 (1983).

Los esposos Ramón Fernández y Madeline White demandaron al Dr. Carlos Moyka, Hospital San Carlos, Inc. y a otros galenos,[2] alegando que Moyka examinó de forma descuidada, negligente y con falta de pericia profesional al único hijo habido entre ambos, Stephen. Diagnosticó *faringitis* cuando el niño estaba padeciendo realmente *meningitis purulenta*, la que ocasionó la muerte apenas quince horas más tarde. Como hechos específicos constitutivos de negligencia por parte del galeno, señalaron que: no realizó un examen adecuado, no efectuó, por sí mismo o por otras personas o medios, pruebas de sangre o del líquido cerebroespinal para poder obtener un diagnóstico acertado, no determinó correctamente la enfermedad, no proveyó tratamiento adecuado y no ordenó su hospitalización inmediata.

En su contestación los demandados negaron esos hechos y alegaron que no actuaron de forma alguna que pudiera considerarse negligente y que, por el contrario, tanto el examen practicado como el tratamiento brindado se realizaron de acuerdo con las mejores normas médicas.

Previa vista en sus méritos, el tribunal de instancia desestimó la acción al concluir que "el tratamiento recibido por el menor fallecido, Stephen David Fernández White, por parte del doctor Carlos Moyka, llena las exigencias profesionales generalmente aceptadas para la práctica de la medicina y libera tanto a éste como a su patrono, el Hospital San Carlos, de responsabilidad en este caso". En reconsideración, confirmó esta sentencia.

---

hechos reales según apreciamos en revisión— que la sintomatología e historial exigían que se explorara y sospechara un diagnóstico de meningitis.

[2] Posteriormente se desistió de la acción contra los otros codemandados: Dra. Servanda Fleitas de Moyka, Hospital Matilde Brenes, Dr. Ángel Abreu, Dr. Héctor Santiago, Dra. Concepción Quiñones de Longo y sus respectivas compañías aseguradoras.

A solicitud de los demandantes, la revisamos. Los errores apuntados giran esencialmente sobre la apreciación de la prueba. La norma de que no intervendremos con esa posición de los foros de instancia sufre excepción en cuanto a la prueba documental —*Asoc. Auténtica Empl.* v. *Municipio de Bayamón*, 111 D.P.R. 527 (1981); *Caribe Crown Cap Corp.* v. *Srio. de Hacienda*, 108 D.P.R. 796, 798 (1979); *Vega Torres* v. *Sucn. Mercado Riera*, 107 D.P.R. 425, 428 (1978); *Ortiz* v. *Cruz Pabón*, 103 D.P.R. 939, 947 (1975)— y pericial —*Velázquez* v. *Ponce Asphalt*, 113 D.P.R. 39 (1982); *Zambrana* v. *Hospital Santo Asilo de Damas*, 109 D.P.R. 517, 522 (1980), y los casos allí citados— sobre la cual estamos en igual posición adjudicativa. Es en virtud de un examen meticuloso y crítico de esa prueba, de la evaluación integral y la interacción de la misma con la evidencia oral que tuvo ante sí el foro primario que alteramos esa apreciación y resolvemos que erró al desestimar la demanda. *Quintana Tirado* v. *Longoria*, 112 D.P.R. 276 (1982); *Acosta & Rodas, Inc.* v. *PRAICO*, 112 D.P.R. 583 (1982).

I

*Trasfondo fáctico*

El 26 de marzo de 1973 Stephen Fernández White, de seis (6) años, fue llevado al Hospital Regional de Bayamón para recibir tratamiento por dolor de oídos. Debido a su dolencia, no asistió a la escuela al día siguiente. Por no encontrarse bien, el miércoles 28 fue enviado a su casa antes de finalizar las clases. En horas de la tarde se quejó de dolor de cabeza. Aproximadamente a las 2:00 a.m. del día 29 despertó quejándose a sus padres, quienes lo llevaron a la sala de emergencia del Hospital San Carlos a donde llegaron aproximadamente a las 4:30 a.m. Fueron recibidos por la Srta. Margarita Jaca, enfermera graduada de turno. Procedió a llenar el formulario de información al paciente. Éste fue atendido por el Dr. Carlos Moyka, interno bajo el Programa de Internos del Departamento de Salud, quien

estaba de "guardia" y se desempeñaba sin supervisión directa. No había otros presentes en ese momento.

El examen físico de aproximadamente diez (10) minutos que le hizo el doctor Moyka arrojó resultados completamente negativos, con la excepción de que, a su juicio, dicho paciente mostraba la garganta enrojecida. No recomendó ni ordenó exámenes de laboratorio. El diagnóstico fue de faringitis o infección de la garganta y vómitos. Le prescribió y administró eritromicina, "tylenol" para la fiebre y una inyección de "tigan" intramuscular para los vómitos que, según determinó el doctor Moyka, eran de contenido alimenticio. Apercibió a los padres de que observaran al niño y si no mejoraba, que regresaran. Al continuar enfermo fue llevado —a eso de las 9:30 a.m.— al consultorio de su pediatra, el doctor Vázquez Casanova. Luego de atenderlo, lo refirió inmediatamente al Hospital Matilde Brenes para ser recluido. El niño continuaba consciente, aunque su condición era precaria. Alrededor de las 10:30 a.m. fue examinado y admitido en estado comatoso. Le realizaron pruebas de azúcar sanguínea y se obtuvieron resultados positivos. Además se le efectuó una punción lumbar en la sala de emergencia —alrededor de las 11:15 a.m.—pero por alguna razón inexplicada en el récord, no se obtuvo el resultado de esa prueba. Como diagnósticos provisionales, el Dr. Ángel Abreu determinó acidosis diabética, *otitis media* y *meningitis*. Posteriormente y durante su breve hospitalización, intervinieron con el niño los doctores Vázquez, Héctor Santiago Santos y Concepción Quiñones de Longo. Se le administró una dosis de antibiótico —lincocin— líquido intravenoso y una dosis de insulina, entre otros medicamentos. Por no responder positivamente al tratamiento y por continuar el deterioro de su condición, se comenzó el procedimiento para efectuar una segunda punción lumbar. De esta forma se determinaría o se descartaría categóricamente la meningitis. No se llevó a cabo la misma debido a

su muerte. El patólogo forense determinó que fue ocasionada por *meningitis supurada.*

## II

*Normas sobre salas de emergencia y de diagnóstico*

La prueba pericial ante el tribunal de instancia demostró que no constituye la mejor práctica que los internos hagan guardia sin supervisión directa en las salas de emergencia. Sin embargo, para la fecha de los hechos era una rutina generalizada refrendada por el Departamento de Salud. Dicho departamento había autorizado la supervisión indirecta, no inmediata, esto es, que hubiese un médico "disponible mediante llamada". 24 R.&R.P.R. sec. 18–221. Esa práctica no es buena. Al presente ha sido abandonada. R. Crawford Morris, *Legal Problems of Emergency Outpatient Care*, Nat. Medicolegal Symposium 1973, Chicago, Illinois, ABA Press, 1974, págs. 8–14.

Aun reconociendo las dificultades de reclutamiento y los costos que ello genera, la importancia de una sala de emergencia es incuestionable. Su nombre lo prueba: *emergencia.* Brindar este servicio a través de internos o el personal menos experimentado es un contrasentido. Solo nos es posible sancionar esa práctica si existe una supervisión inmediata y efectiva que supla las deficiencias y falta de experiencia del interno u otro personal. En el caso de autos, el doctor Moyka no estaba bajo supervisión de médico alguno. El tribunal de origen concluyó que ello no constituyó "negligencia per se", debido a que el Hospital San Carlos era "pequeño y tenía poco tráfico en su Sala de Emergencia", y que no hubo relación causal. Veremos que erró en esto último.

Las partes estipularon que el doctor Moyka diagnosticó *faringitis* a Stephen y que éste murió de *meningitis purulenta* horas después.([3]) Obviamente cometió un error al diagnosticar el verdadero padecimiento del niño.

---

([3]) Las partes estipularon, entre otras cosas, el contenido del examen y diagnóstico patológico.

Debemos, pues, concentrarnos en la dinámica de un diagnóstico y sus etapas correspondientes, en particular el examen físico.

En las acciones basadas en error de diagnóstico la alegación más común es que el médico no llevó a cabo un examen cuidadoso del paciente. A. R. Holder, *Medical Malpractice Law*, 2da ed., New York, John Wiley & Sons, Inc., 1978, pág. 74. Naturalmente, se acepta que en el mundo real no existe tal cosa como un examen físico completo. Por ello la metodología de la medicina moderna parte de varias premisas. *Primero*, un examen básico rutinario permitirá, de ordinario, identificar casi cualquier anormalidad significativa. Identificada ésta, se procederá a inspeccionar en detalle el área que representa problemas. El propósito es detectar con el mayor grado de certeza posible el misterio de determinada dolencia, esto es, obtener un diagnóstico. Un buen método es aquel basado en una rutina lógica y ordenada. Al desarrollarse este plan sistemático se logra economizar tiempo y se minimiza el riesgo de error por omisión. La experiencia demuestra que son más los errores de este tipo que los de acción. 9 Cantor, *Traumatic Medicine and Surgery for the Attorney*, Washington, D.C., Butterworth, Inc., 1963, pág. 604, párr. 2408(2). Claro está, no puede diagnosticarse una condición propiamente si no se tiene razón alguna para sospechar su existencia. Holder, *op. cit.*, pág. 71. *Segundo*, un diagnóstico correcto depende de dos factores importantes: la recopilación y el análisis de información. El primero, acopio de datos, requiere del médico capacidad para obtener datos certeros mediante la entrevista médica, el historial del paciente y el examen físico. El análisis conduce al objetivo perseguido mediante una evaluación lógica de los datos ante sí. Este proceso demanda conocimientos abarcadores y nociones de esta rama del saber. Reconocer sus propias limitaciones y saber cuándo referir un paciente a otro médico o acceder a cualquier consulta que éste o sus familiares interesen, es proce-

dente y representa un curso de acción normal y contemplado del proceso. Sherman y Fields, *Guide to Patient Evaluation*, 3ra ed., New York, Medical Examination Publishing Co., Inc., 1978, pág. 335. El médico examinador puede desorientarse o simplemente no detectar anormalidades debido a falta de destreza o tiempo, o por ausencia de claves atribuibles a un historial incompleto. Sharpe, Fiscina y Head, *Law and Medicine*, Saint Paul, Minnesota, West Publishing Co., 1978, pág. 26. Por ende, el acopio negligente de información esencial es fuente que genera responsabilidad profesional en daños. Adametz, *Failure to Make Diagnostic Test*, 210 J.A.M.A. 213 (1969). La importancia del historial médico estriba en que sugiere áreas que deben ser escrutadas en el examen físico y establece las bases para iniciar posibles diagnósticos. Se puede obtener mediante un informe narrativo del paciente, familiar cercano o persona que lo conozca, comenzando desde el momento en que por última vez se sintió bien. Precisamente ese momento es el que debe servir de punto de partida para un interrogatorio meticuloso concerniente a la presencia o ausencia de síntomas o signos reveladores. Se requiere que se formulen todas las preguntas cuyas contestaciones muevan o permitan obtener toda la información necesaria y relevante. Es tarea investigativa cuyo éxito depende de múltiples factores tales como edad del paciente, preparación, grado de precisión, capacidad para recordar y otros. No debe descansarse tan sólo en lo que le suministra voluntariamente el paciente. Holder, *op. cit.*, pág. 72. Además de ese historial, se impone el uso auxiliar de pruebas rutinarias, sencillas y económicas de laboratorio para diagnosticar la condición de un paciente. Su omisión también puede ser motivo para incurrir en responsabilidad por negligencia. Holder, *op. cit.*, pág. 85.

Aunque aspiramos a la perfección, esa cualidad solo corresponde al Sumo Hacedor. Conscientes de esa limitación humana, nuestro ordenamiento concibe el error en el diag-

nóstico como una realidad, que en ocasiones es defensa o eximente. Para esgrimirla con éxito es menester que se observe un grado razonable de cuidado, realizando un *examen completo* del paciente —*Morales* v. *Hosp. Matilde Brenes*, 102 D.P.R. 188, 194 (1974)— y haciendo un "esfuerzo concienzudo" —*Oliveros* v. *Abréu*, 101 D.P.R. 209, 227 (1973). En *Oliveros* expresamos que un médico "no es responsable de mala práctica cuando se enfrenta a una situación en la cual cabe *duda educada* y razonable sobre cuál debe ser el curso a seguir". (Énfasis nuestro.) Pág. 228. Ese tipo de error no implica negligencia, pues se aceptan los errores razonables de juicio, pero éstos tienen que estar basados en un criterio de razonabilidad en donde se requiere "que el médico efectúe todos los *exámenes necesarios* para llegar a un diagnóstico correcto. Tiene el deber de hacer un esfuerzo honesto y concienzudo para enterarse de los síntomas y de la condición del paciente". *Morales*, supra, pág. 194. (Énfasis nuestro.) Se exige que ponga de manifiesto su juicio, su prudencia y razonabilidad en el intento de llegar a un diagnóstico correcto al cumplir con su deber de esforzarse por conocer la verdadera condición del paciente. *Rosado Rosado* v. *E.L.A.*, 108 D.P.R. 789 (1979).

### III

*Consideraciones generales de la meningitis*

Conforme el *Manual de Merck*, 3ra ed., pág. 665, la meningitis es una inflamación aguda de las meninges del cerebro o de la médula espinal, o de ambas, con las siguientes características:

> La enfermedad puede ser causada por virus, bacterias, protozoos, levaduras u hongos, introducidos generalmente en las meninges a partir de focos en otras partes del cuerpo. Es una *complicación* cuya aparición se debe vigilar en los casos de *otitis media*, mastoiditis y rotura de absceso cerebral. . . .
>
> Se debe pensar en la meningitis en presencia *de fiebre con dolor de cabeza* (generalmente intenso), acompañado de *dolor*

*y rigidez* de nuca y espalda y signos positivos de Kerning y de Brudzinski. Son de observar alteraciones del sensorio y de la respuesta emocional. Oscilan éstas entre alteraciones ligeras de la conducta o una leve irritabilidad, al comienzo de la meningitis tuberculosa, y un coma profundo en la meningitis purulenta declarada. En los casos purulentos hay leucositosis. (Énfasis nuestro.)

Su desarrollo es usualmente rápido, de 12 a 14 horas, aunque el curso de la enfermedad puede variar de abrupta y fulminante a insidiosa. Se reconoce que en los recién nacidos e infantes la sintomatología puede ser vaga y nebulosa. (Véase el Apéndice.) Los síntomas dependen del grado avanzado de la enfermedad. Sin embargo, hay un indicador básico que debe alertar al médico. Un foco de infección como pneumonía, celulitis, absceso abdominal, otitis o faringitis está subyacente. "El diagnóstico de laboratorio de la meningitis está basado en un examen del líquido cefalorraquídeo. Adicionalmente, los cultivos de sangre, garganta, oído y orina ayudan." R. C. Llewelling y D. M. Jarrot, *Bacterial Meningitis*, Conn. & Conn., Current Diagnosis, W. B. Saunders Co., 1974, págs. 871–873 (traducción nuestra); I. Butler y R. Johnson, *Infecciones del Sistema Nervioso Central*, Clínicas Pediátricas de Norteamérica, Interamericana, agosto de 1974, págs. 651–656. Debido a que el proceso es rápido y, sin terapia apropiada, fatal, se recomienda un enfoque de diagnóstico agresivo y de alta sospecha de meningitis. Llewelling y Jarrot, *op. cit.*, pág. 872.

## IV

*Prueba y conclusiones del tribunal*

El dictamen del tribunal de instancia estuvo fundado, en gran medida, en la duda que dicho foro abrigó sobre lo que ocasionó la muerte a Stephen. Veamos.

El tribunal a quo determinó que aun cuando el "certificado de autopsia indica que la causa de la muerte del menor

Fernández White fue una meningitis purulenta entendemos que, aun dicho diagnóstico patológico fue puesto en tela de juicio por el testimonio robusto y convincente prestado a esos efectos por la Dra. Rosa Fiol, perito de la parte demandada. La doctora Fiol, después de examinar los records completos del paciente, *así como también las laminillas de tejidos preparadas* por el doctor Loynaz en la autopsia de Stephen, concluye que no puede afirmarse, de forma categórica que este paciente falleciera de meningitis purulenta por haber muy poc[o] pus en las meninges. Afirmó, además, la doctora Fiol que, en base al cuadro completo que presentaba este paciente, no podía descartarse que hubiere fallecido de un [coma] diabético." (Énfasis nuestro.)

Notamos que el juzgador de los hechos no descartó totalmente la validez del informe del patólogo. El testimonio de la doctora Fiol no excluyó de manera alguna y definitiva el diagnóstico final de meningitis. Lo que hace es señalar la *posibilidad* de la existencia de otro padecimiento que pudo haber ocasionado la muerte al paciente. Ella reconocía que de los hallazgos encontrados en la laminilla del cerebro se tenía que hacer el diagnóstico de una meningitis aguda supurada. (T.E., Vol. II, pág. 167.) El doctor Loynaz, patólogo forense, en su informe de autopsia determinó que "[l]as membranas aracnoides presentan *numerosas* áreas de apariencia purulenta color verde pálido, distribuídas en ambos hemisferios cerebrales, tanto en sus superficies convexas como en sus superficies basales". Finalizó concluyendo que "[e]l procedimiento de autopsia *reveló una meningitis purulenta como causa de muerte*, no apreciándose evidencias de meningococemia, tratándose más bien de una meningitis de tipo purulenta secundaria al parecer a la *otitis* antes mencionada". (Énfasis suplido.)

En las circunstancias apuntadas no podemos conjeturar y descartar el valor investigativo de la autopsia. El testimonio de la doctora Fiol (4) no puede tener el efecto de sustituir

---

(4) Ella expresó haber visto las laminillas con antelación a una deposición que

el dictamen efectuado por el patólogo forense, el cual tuvo el beneficio ante sí de examinar las áreas afectadas. Todos los indicadores objetivos, la otitis previa y demás sintomatología tienden a corroborar la meningitis. No compartimos la duda del tribunal sentenciador.

Despejada toda incertidumbre sobre la causa real de la muerte de Stephen, dirigimos nuestra atención al aspecto crucial del caso: el examen físico realizado por el doctor Moyka. Según la prueba desfilada, la señora White testificó en el directo que su hijo vomitó en presencia del médico; que el niño procedió a subirse a la mesa de exámenes sin ninguna ayuda; que Stephen le expresó al galeno que "no me duele la garganta, lo que me duele es mi cabeza"; que además de examinarle la garganta, de ponerle una inyección y tomarle el pulso *no se le hizo ningún otro examen*; que el examen físico duró alrededor de *siete minutos*; que durante ese tiempo no le hicieron a ella preguntas sobre la condición del menor y ella fue quien le dio a conocer *que tenía una infección en los oídos* y aconsejó al médico que se los examinara; que éste le expresó que el niño no tenía nada en los oídos; que nadie en ningún momento le preguntó sobre el historial previo del niño; y que el doctor Moyka no hizo exámenes de reflejos a su hijo. (T.E., Vol. I, págs. 7–11 y 19.) En el contrainterrogatorio expresó que su esposo llevó en brazos al niño hasta la camilla de exámenes, que estuvo presente durante todo el tiempo del examen, que explicó sobre la infección de oídos, y que el examen físico se prolongó por espacio de siete u ocho minutos. (T.E., Vol. I, págs. 24 y 31.)

Por su parte el doctor Moyka atestó en el directo que

le fue tomada. (T.E., Vol. II, pág. 165.) En ese procedimiento enumeró la información o materiales que le habían sido suministrados para el estudio del caso y sobre los cuales basó una opinión, pero olvidó indicar que había examinado las laminillas que contenían las muestras del área afectada tomadas por el patólogo, esenciales para determinar la causa de la muerte. Confrontada con esa omisión expresó que se debió a que no se le ocurrió mencionarlas y que no le fue preguntado. (T.E., Vol. II, pág. 204.)

Stephen llegó caminando al cubículo de exámenes; que no necesitó ayuda para subirse a la camilla; que preguntó a la señora White las razones por las cuales traía al niño a la sala de emergencia y de qué se quejaba y que le contestó que había vomitado la cena del día anterior; que preguntó sobre el historial reciente del paciente y la contestación recibida y repetida en varias ocasiones fue en la negativa. Sobre el alcance del examen atestó que le practicó un examen de *rutina*, el cual consistió en examinarle la boca, la garganta, los oídos, los ojos, auscultar el pulmón y auscultar y palpar abdomen; que estando el paciente acostado le puso la mano debajo de la cabeza para examinar la rigidez, prueba que fue negativa; *que el examen practicado duró alrededor de diez minutos*; que tan sólo encontró la garganta eritematosa y diagnosticó faringitis; y que no hubo ningún otro hallazgo. Finalizó expresando que el paciente salió caminando de la sala. (T.E., Vol. II, págs. 4-6.)

En el contrainterrogatorio admitió que no preguntó al niño si tenía dolor de cabeza; que tan sólo preguntó por los síntomas y como contestación recibió la de vómitos y fiebre; que tampoco preguntó si el niño tenía escalofríos; que el niño no vomitó en su presencia; que la señora Fernández White no le dio a conocer que el niño estaba padeciendo de dolor de cabeza; que el niño tampoco le dijo nada sobre síntoma alguno; que no le tomó la presión; que no le hizo fondo de ojos; que la madre le había dado a conocer *que el niño había tenido un episodio de otitis* y que, en fin, presentaba distintos cuadros en distintos momentos; que tan sólo le tomó los reflejos del cuello, —levantándole la cabeza únicamente— y no le tomó los de los tendones; que no hizo un examen neurológico; que "chequeó" los oídos; que examinó boca, garganta, ojos y auscultó el corazón y pulmones y palpó el abdomen; que no se le informó que había ido a un dispensario hacía tres o cuatro días para una cuestión de los oídos; y que no pesó al niño. (T.E., Vol. II, págs. 27-28, 41-50, 50-51, 59-60, 64 y 78.)

La Srta. Margarita Jaca, enfermera de turno, atestó que el niño llegó a la Sala de Exámenes caminando; *que se veía un poco triste*; que, a pesar de no recordar bien, el examen duró unos *diez* o quince minutos; que *no recuerda* si Stephen vomitó; que la madre del niño no le "contó" del historial que "tenía" el niño; que ella preguntó las razones de la visita de emergencia y tan sólo le indicaron que el niño tenía fiebre; que no le preguntó desde cuándo estaba padeciéndola; que no le dijo que el niño estuviera padeciendo de dolores de cabeza; y que el paciente no se quejó de dolor de cabeza ni de ningún otro padecimiento en forma alguna. (T.E., Vol. II, págs. 101–102, 109–110.)

El tribunal sentenciador concluyó que "el menor Fernández White entró caminando por sus propios pies a la Sala de Emergencia. . ."; que a preguntas de la enfermera sobre la condición del menor éstos contestaron que "su hijo había estado bien hasta ese día cuando despertó con vómitos, fiebre y tos. . ."; que "[e]l niño caminó desde la sala de espera hasta la salita de exámenes y se subió en la mesa de exámenes sin ayuda. . ."; que "[e]l doctor Moyka procedió a hacerle al paciente un examen general completo, inclu[sive la] prueba para rigidez de nuca, arrojando dicho examen resultados completamente negativos con la excepción de que dicho paciente mostraba la garganta enrojecida"; que por la descripción que hizo la señora Fernández de los vómitos, el doctor Moyka concluyó que éstos eran de tipo alimenticio; que basándose en el examen practicado al paciente, a la sintomatología que éste presentaba y al historial obtenido de la madre de éste, el recurrido diagnosticó faringitis o infección de la garganta y vómitos, que la temperatura rectal del paciente fue de treinta y nueve grados centígrados, pulso de noventa y respiración de veintidós por minuto; que "[e]l aspecto general del niño mientras estuvo en Sala de Emergencia era bueno y éste no se veía agudamente enfermo"; que después de haber tratado al paciente,

el doctor Moyka lo envió para el hogar y apercibió a los demandantes que de no mejorar lo trajeran nuevamente.

En virtud de esa apreciación, el tribunal a quo determinó que "[e]n el caso ante nosotros la totalidad de la evidencia presentada demuestra que la sintomatología que presentaba el menor Fernández White al momento de ser examinado y tratado por el doctor Moyka en la Sala de Emergencia del Hospital San Carlos no era una típica de meningitis. Tampoco despertaba sospechas el historial que fuera brindado a éste por la madre del paciente. Habiendo encontrado, entonces, el doctor Moyka la justificación para el cuadro de fiebre que presentaba el paciente al notar su garganta enrojecida, estuvo plenamente justificado el diagnóstico que éste hiciere de faringitis o infección de la garganta y el tratamiento de antibióticos que prescribiera. Sin embargo, el doctor Moyka demostró gran celo profesional y preocupación por su paciente cuando le indicó a la madre de Stephen que observara a dicho menor y que, de no mejorar, lo trajera de nuevo al Hospital San Carlos para tratamiento adicional".

IV

*Análisis en revisión*

Resulta difícil aceptar la determinación del tribunal a quo basada en el testimonio del doctor Moyka. Existen lagunas esenciales y explicaciones ilógicas al respecto. Veamos. Se trata de un padre y una madre que legítimamente preocupados por la condición de salud del único hijo habido entre ellos, lo llevan a la sala de emergencia. ¿Es lógico creer que la madre no le hizo saber al médico o a la enfermera los síntomas que venía padeciendo su hijo desde días anteriores?(5) Si el doctor Moyka aceptó en el contrainte-

---

(5) En la hoja de apuntes que se preparó en la sala de emergencia del Hospital Matilde Brenes se hizo constar, por información suplida por sus progenitores, que el niño había visitado el Hospital San Carlos debido a, entre otros síntomas, vómitos, fiebre y dolor de cabeza. (*Exhibit* I de la demandada.)

rrogatorio que la madre le dio a conocer el episodio pasado de otitis, ¿es creíble que realizó "un esfuerzo honesto y concienzudo para enterarse de los síntomas"? (6)

Estas incógnitas y dudas se acentúan ante el hecho de que el expediente que se le llenó en la sala de emergencia del Hospital San Carlos está prácticamente huérfano de datos. Como dato curioso, no hace referencia sobre todas las alegadas áreas cubiertas en el examen físico, según expresó el doctor Moyka en su testimonio. Solamente consignó "temp. 39° rectal; pulso 90; respiración 22; garganta algo enrojecida; pulmones claros; *no signo deshidratación".* Notamos que esta última apreciación sobre ausencia de signo de deshidratación, lo mismo que la frase "observar y regresar si el niño no mejora" y "tylenol" están escritas con otro tipo de bolígrafo y estilografía. Ello, en lugar de debilitar, tiende a corroborar las expresiones vertidas por la señora White. ¿Cómo explicar que dicho galeno no percibiera todos los síntomas que razonablemente mostraba Stephen, corroborados cuatro (4) horas más tarde con la intervención de su pediatra, el doctor Vázquez Casanova, y su orden de ingreso al hospital más cercano? A la luz de las inferencias lógicas y del curso normal de los acontecimientos humanos, concluimos que al ser examinado por el doctor Moyka, Stephen presentaba los signos y síntomas compatibles con un cuadro de meningitis.

Así lo reflejaba la sintomatología e historial de Stephen. Según el doctor Moyka, el niño presentaba el siguiente cuadro clínico: edad, 6 años; temperatura, 39°C rectal; pulsaciones, 90 por minuto; y respiración, 22 por minuto. Como trasfondo de estas manifestaciones físicas, existía un histo-

---

(6) En la hoja antes descrita se señala que el tímpano derecho aparece prominente y opaco, pero no existe otitis externa activa. Recordemos que el doctor Moyka atestó haber examinado los oídos de Stephen y no haber encontrado nada anormal. Además se señaló que éste tenía alguna rigidez del cuello ("Active Brudzinski"). El demandado expresó que no percibió este signo, a pesar de haber hecho prueba al efecto.

rial de fiebre, vómitos, dolor de cabeza e infección de oídos (otitis).

Al contrastar estos síntomas con los clásicos que presenta un paciente que sufre de meningitis, tenemos fiebre, dolor de cabeza, vómitos, rigidez de espalda y nuca y signos positivos de Kerning[7] y Brudzinski.[8] Cecil, *Textbook of Medicine*, 15ta ed., W. B. Saunders Co., 1979, pág. 411; y *Harrison's Principles of Internal Medicine*, 8va ed., McGraw-Hill, 1977, pág. 1887. Estos últimos dos signos no siempre están presentes. Aun así, no es razón para no realizar las pruebas al efecto y descartar la meningitis como posible diagnóstico. En el caso de autos el doctor Moyka no procedió a efectuar el examen apropiado en Stephen para identificar los signos. No enfocó su diagnóstico agresivamente y con sospecha fundada. No hizo uso de ningún examen de laboratorio. Por consiguiente, no hubiese podido percatarse de la existencia de la meningitis que ya estaba presente.

Reconocemos que estos síntomas pueden ser indicio de otras enfermedades. Sin embargo, si el historial y los síntomas de un paciente sugieren más de un diagnóstico, es deber del médico llevar a cabo diagnósticos diferenciales y emprender un proceso de eliminación mediante las evaluaciones conocidas y prevalecientes en la profesión. *Negrón* v. *Municipio de San Juan*, 107 D.P.R. 375 (1978); *Pérez* v. *E.L.A.*, 95 D.P.R. 745 (1968); Holder, *Failure to Diagnose*

[7] "Signo típico de meningitis que revela el estado de contractura muscular, constante en esta afección. Consiste en la imposibilidad de colocar la pierna en extensión completa cuando el muslo está en ángulo recto con respecto a la pelvis, sea que el paciente está acostado o sentado. La maniobra es sumamente dolorosa." *Diccionario de Ciencias Médicas Torland*, 6ta ed., W. B. Saunders Company, 1979, pág. 1334.

[8] "En la meningitis, estando el paciente acostado, si se le flexiona rápidamente la cabeza mientras con la otra mano se le sujeta el pecho, se produce un movimiento de flexión de los muslos y de las piernas; d.t. signo de la nuca. En la meningitis, cuando se hace una flexión pasiva de un miembro inferior, se produce un movimiento análogo con el otro miembro; d.t. reflejo de Brudzinski, signo contralateral de la pierna." Íd., pág. 1328.

*Infection*, 220 J.A.M.A. 321 (1976). Resolvemos que el doctor Moyka no descargó satisfactoriamente su responsabilidad profesional al descartar un posible diagnóstico sin haber agotado el proceso de eliminación, entre otros posibles, cuyas consecuencias podrían resultar en la pérdida de una vida. *Morales*, supra, pág. 188. Con la sintomatología que presentó el niño debió haber considerado, entre otros, un diagnóstico diferencial de meningitis y proceder con los exámenes de rigor para descartarlo o adoptarlo definitivamente. En particular debió recomendar y efectuar una punción lumbar, de autorizarlo los padres. Indudablemente luego de estudiar en el laboratorio el líquido cerebroespinal hubiese obtenido un resultado concluyente. Esta prueba es la única que permite un diagnóstico definitivo. Harrison, *op. cit.*, pág. 1887. En la alternativa, pudo y debió solicitar los servicios del médico a cargo de supervisarlo o de un especialista para obtener asesoramiento. Tales omisiones constituyen fuente de responsabilidad civil. [9]

La parte demandada arguye que "la sintomatología que presentaba el niño era un cuadro sumamente confuso cuando ninguno de los médicos que atendieron al niño luego de haber sido examinado por el Dr. Moyka . . . inclu[sive] su pediatra regular, un médico con licencia y experiencia en el manejo de Sala de Emergencia (doctor Abreu), la doctora Quiñones de Longo, pediatra asignada al caso . . . pudieron hacer un diagnóstico definitivo de meningitis ni tratar dicha condición".

---

[9] Tanto el testimonio del Dr. Juan Francisco Jiménez como el del doctor Mirabal Font —tendentes a sostener que el tratamiento brindado por el doctor Moyka fue adecuado— carecen de poder persuasivo alguno, pues ambos parten de una premisa errónea para llegar a esa conclusión: un historial clínico distinto al que en realidad presentaba Stephen. El doctor Jiménez, al presentársele un cuadro médico hipotético *idéntico* al que en realidad presentaba Stephen, aceptó que, entre otros, se tendría que considerar el diagnóstico de meningitis. (T.E., Vol. II, pág. 218.) Además expresó que en caso de sospecha no hubiese enviado el paciente a su casa. Indicó que hubiese procedido a observarlo y luego le hubiera efectuado una punción lumbar. (T.E., Vol. II, pág. 220.)

El argumento no es convincente. Cuando lo examinó el doctor Moyka no existía tal cuadro confuso. Stephen tenía probabilidades razonables de sobrevivir. (T.E., Vol. I, pág. 52.) Demostrativo de ello es que su pediatra al examinarlo y encontrarlo tan enfermo, ordenó su ingreso al Hospital Matilde Brenes inmediatamente. En la sala de emergencia de dicha institución el doctor Abreu procedió a diagnosticar *meningitis* provisionalmente; además, procedió a efectuarle una punción. Por desgracia, no pudo obtenerse el resultado de esta prueba. De haberse logrado, se hubiese diagnosticado de forma categórica el padecimiento, aunque su estado era comatoso y nos resulta cuestionable su supervivencia sin secuelas graves y permanentes. Actuaciones negligentes de este género crean cuadros clínicos confusos.

Recapitulando, en el caso de autos el error en el diagnóstico no es defensa válida, pues estuvo inducido por un examen físico incompleto que no permitió al galeno Moyka tener ante sí todo el cuadro clínico y la sintomatología real que presentaba Stephen. Ello fue la única causa de que incurriera en dicho error, que finalmente propició la muerte del menor. Su omisión de seguir las normas previamente indicadas y su falta de cuidado engendran responsabilidad contra él y su principal, el Hospital San Carlos, Inc.

Finalmente, la sala de instancia pone énfasis en el "gran celo profesional y preocupación por su paciente" desplegado por el doctor Moyka al indicarle a la madre de Stephen que lo observara y que de no mejorar lo trajera de nuevo al hospital. Sin cuestionar la buena intención del galeno, la caracterización raya en la hipérbole. Ese tipo de apercibimiento o recomendación es mandatoria en todo caso al dar de alta a un paciente. Forma parte del abecedario básico médico.

Por los fundamentos expuestos, disentimos. Dictaríamos sentencia en que se revocara la del Tribunal Superior, Sala de San Juan, y ordenaríamos la devolución de los autos para la continuación de los procedimientos compatibles con el pronunciamiento de que se probó negligencia.

APÉNDICE

## FRECUENCIA DE SÍNTOMAS Y SIGNOS DE MENINGITIS POR EDADES

| | Menos de un mes | 1–12 meses | 1–10 años | Adultos |
|---|---|---|---|---|
| Fiebre | 60% | 90% | [95%] | 95% |
| Convulsiones | 100% | 70% | 50% | 20% |
| Dolor de cabeza | 0% | 20% | [70%] | 90% |
| Irritabilidad | 90% | 95% | 70% | 65% |
| Coma | 50% | 20% | 10% | 5% |
| Rigidez de la nuca | 10% | 30% | [70%] | 80% |
| Fotofobia | 0% | 5% | 10% | 40% |
| Afección respiratoria por infección de la tráquea | 40% | 60% | [50%] | 25% |
| Protuberancia fontanela | 80% | 25% | 0% | 0% |

Fuente de Información: R. Llewelling y D. Jarrot, *Bacterial Meningitis*, supra, pág. 87.