Opinión disidente emitida por la
Juez Asociada Señora Rodríguez Rodríguez.
Los recursos de epígrafe nos brindan la oportunidad de examinar dos controversias relacionadas con el régimen de propiedad horizontal. Primero, ¿hasta qué punto son ilícitas las reservas o condiciones diseñadas para variar el uso asignado a los apartamientos en la escritura matriz del condominio? Segundo, ¿hasta qué punto constituye un principio general del Derecho la norma pautada en el Artículo 38-C(d) de la Ley de Condominios, que proscribe la oposición infundada a los acuerdos del Consejo de Titulares sujetos al requisito de unanimidad?
La respuesta que ofrece la Mayoría a estas interrogantes nos parece incorrecta, por lo cual disiento del curso de acción pautado.
*743 I
La Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico (SEAM) edificó una torre de oficinas médicas en un terreno cercano al Hospital. Auxilio Mutuo (Hospital). El propósito era vender las oficinas a los profesionales de la salud que interesaran establecer allí sus prácticas privadas, lo cual incrementaría la demanda de los servicios ambulatorios que ofrece el Hospital. Sentencia del Tribunal de Primera Instancia (Sentencia TPI), Apéndice de la Petición de Certiorari presentada por la SEAM (Apéndice I), págs. 955-956.
Antes de someter el inmueble al régimen de propiedad horizontal, la SEAM otorgó opciones de compraventa sobre la mayoría de las oficinas. Así, el Dr. José Alfonso Serrano Muñoz sujetó a opción la Oficina 702, asignada a la cardiología, el 15 de mayo de 1996. Sentencia TPI, pág. 957; Contrato de Opción de Compra sobre Propiedad Horizontal, Apéndice I, págs. 536-543.
La torre quedó sometida al régimen de propiedad horizontal mediante la escritura número dos otorgada el 1 de mayo de 2000 ante el notario Luis Oscar Ramos Hernández (Escritura Matriz).(1) Dicho instrumento disponía que cada oficina se dedicaría a determinada área de la medicina.(2) No obstante, permitía que se variara el uso de las oficinas mediante el consentimiento unánime de los *744 condominos o, dadas las circunstancias que luego examinaremos, mediante la decisión unilateral del titular.(3) Sentencia TPI, págs. 957-958; Escritura Matriz, Apéndice I, págs. 584-743.
La SEAM vendió y entregó la Oficina 702 al doctor Serrano Muñoz y a su esposa, María Rosa Freiría Mendía, mediante la escritura número 158 otorgada ante el notario Francisco M. Vázquez Santoni el 18 de abril de 2001 (Escritura 158). Era ésta una de quince oficinas dedicadas a la cardiología en la Escritura Matriz.(4) Sentencia TPI, págs. 955 y 958; Escritura 158, Apéndice I, págs. 764-778; Escritura Matriz, Apéndice I, págs. 617-619.
Durante los próximos meses, hubo modificaciones al uso de varias oficinas antes de su primera venta. Ello ocurría del siguiente modo. La SEAM enviaba una carta a los titulares mediante la cual notificaba el cambio pretendido y les solicitaba que, de tener alguna objeción, la comunicaran por escrito en determinado plazo, pues de otro modo se efectuaría el cambio y la correspondiente compraventa. Todos los cambios ocurrieron sin objeción de los titulares, y la SEAM desistió de al menos un cambio objetado.(5)
Así las cosas, el 18 de abril de 2002 la SEAM otorgó un contrato de promesa de compraventa con los doctores Pedro Redondo Díaz y Rafael Lastra Hernández. Estos se comprometieron a comprar, y la SEAM a vender, la Oficina 518. Dicha unidad se dedicaría a la cardiología. Contrato de Promesa de Compraventa sobre Propiedad Horizontal, Apéndice I, págs. 779-782.
El uso asignado a la Oficina 518, sin embargo, era la *745 otorrinolaringología. De ahí que el 18 de junio de 2002 la SEAM notificó a los titulares su intención de vender la Oficina 518 a los cardiólogos Redondo Díaz, Lastra Hernández y Jorge Lastra Inserni.(6) Se indicó que éstos eran titulares de la Oficina 516(7) y que deseaban “expandir la práctica que actualmente tienen”, lo cual suponía “cambios internos que no afectan el número de oficinas por especialidad en el Condominio Torre de Auxilio Mutuo”. Carta del Sr. Joaquín Quiñoy(8) al doctor Serrano Muñoz de 18 de junio de 2002, Apéndice I, pág. 784; Sentencia TPI, págs. 958-959.
El doctor Serrano Muñoz se opuso al cambio de uso mediante una carta dirigida al señor Quiñoy, cursada dentro del plazo de 60 días concedido. Vale la pena destacar que durante este intercambio epistolario, había once oficinas dedicadas a la cardiología.(9) Sentencia TPI, pág. 959; Carta del doctor Serrano Muñoz al señor Quiñoy de 20 de junio de 2002, Apéndice I, pág. 785.
Esta vez la SEAM desatendió la oposición del titular y procedió con el cambio de uso y enajenación. El doctor Redondo Díaz y su esposa, Cynthia Elizabeth Rivera, adquirieron la Oficina 518 mediante la escritura número 530 otorgada el 30 de septiembre de 2002 ante la notario Adela Surillo Gutiérrez (Escritura 530). Sentencia TPI, pág. 955; Escritura 530, Apéndice I, págs. 790-807.
*746 El 6 de junio de 2003, el doctor Serrano Muñoz, la señora Freiría Mendía y la Sociedad Legal de Gananciales Serrano-Freiría (demandantes recurridos) demandaron a la SEAM, a los esposos Redondo-Rivera y a los doctores Lastra Hernández y Lastra Inserni (peticionarios). Alegaron, principalmente, que el cambio de uso de la Oficina 518 era contrario a la Escritura Matriz y que la SEAM recibió la carta que objetaba el cambio antes de expirar el plazo concedido para ello. Solicitaron un interdicto permanente mediante el cual se prohibiera a los demandados cualquier uso de la Oficina 518, excepto para practicar la otorrinolaringología. También solicitaron la indemnización de sus daños, valorados en $500,000, y la imposición de costas, intereses y honorarios de abogado sobre los demandados. Demanda, Apéndice I, págs. 1-7.
Todos los demandados contestaron. Negaron las alegaciones sustantivas de los peticionarios y levantaron defensas afirmativas. Entre sus defensas, la SEAM adujo que los usos especificados en la Escritura Matriz son vinculantes sólo después de la primera venta de la unidad en cuestión, y que el número de oficinas dedicadas a la cardiología era igual o menor al contemplado en la Escritura Matriz. Los esposos Redondo-Rivera alegaron que desconocían la oposición de los peticionarios, que no hubieran comprado la Oficina 518 de otro modo y que procedieron al amparo de la Escritura Matriz y las expresiones de la SEAM, quien les indicó que no había oposición a la compraventa. También alegaron que el cambio de uso no variaba el número de oficinas dedicadas a la cardiología ni representaba un aumento de la competencia contra los demandantes. Véase los tres documentos Contestación a Demanda, Apéndice I, págs. 8-19.
Tras múltiples sucesos procesales, el foro primario celebró la vista en su fondo. Los demandantes presentaron su prueba y los demandados sometieron el caso sin presentar la suya.(10) Luego se dictó una sentencia, desestimando la *747 demanda.(11) Resolvió el tribunal que los usos especificados en la Escritura Matriz son vinculantes sólo después de la primera venta de la unidad en cuestión, dada la intención de las partes y los términos claros de la Escritura y de los contratos de compraventa. Citando a Cond. Prof. S.J. H. Centre v. P.R.F., Inc., 133 D.P.R. 488 (1993), explicó que tal acuerdo es ilícito sólo cuando se trata de un condominio comercial o profesional donde los titulares tienen una garantía de exclusividad, circunstancia que no existe en el Condominio Torre del Auxilio Mutuo.
Independientemente de si hubo una reserva lícita con respecto al cambio de uso, el foro sentenciador concluyó que procedía desestimar la demanda, pues la restricción de uso es inoponible a la SEAM y a los esposos RedondoRivera. En cuanto a la SEAM, destacó el Tribunal que, según Soto Vázquez v. Vázquez Torres, 138 D.P.R. 282 (1995), tales restricciones en los condominios profesionales deben ser sumamente claras, condición incumplida en el caso de autos. Con respecto a los esposos Redondo-Rivera, el Tribunal resolvió que les cobija la tercería registral. También ordenó que los demandantes pagaran las costas de cada demandado y $1,000 a los doctores Lastra, conjuntamente, por temeridad. Sentencia TPI, págs. 951-971.
Los demandantes recurridos apelaron oportunamente la susodicha sentencia al Tribunal de Apelaciones. Éste revocó.(12) Comenzó por descartar la apreciación fáctica del foro primario e interpretar que la Escritura Matriz no faculta a la SEAM para variar el uso de las unidades antes *748 de su primera venta. Enfatizó que toda la prueba testifical apoya esa interpretación, así como el contrato de opción de los demandantes, el cual les garantizó que no se cambiarían los usos de las demás oficinas en detrimento de su propiedad ni del edificio.
El foro a quo añadió que la SEAM no podía reservarse la facultad de variar unilateralmente el uso de las unidades. Su razonamiento fue como sigue. El derecho aplicable surge principalmente de la Ley de Propiedad Horizontal, Ley Núm. 104 de 25 de junio de 1958 (Ley Núm. 104), según enmendada, 31 L.P.R.A sec. 1291 et seq., pero sin incluir las enmiendas que constituyen la nueva Ley de Condominios. Aquella ley exigía que la escritura matriz de un condominio especificara el uso de cada unidad, uso que podría variarse sólo con el consentimiento unánime de los titulares. Ello prohibía toda reserva del derecho de cambiar un uso sin el consentimiento unánime de los condominos, según Cond. Prof. S.J. H. Centre v. P.R.F., Inc., supra. Por último, el Tribunal de Apelaciones concluyó, inter alia,(13) que los esposos Redondo no gozan de la tercería registral.(14)
Los peticionarios acuden oportunamente ante nosotros mediante una trinidad de recursos. Imputan error al resolverse, en síntesis: (1) que son ilícitas las reservas del derecho de variar el uso de un apartamiento, cuando éstas se incluyen en las escrituras matriz y de compraventa; (2) que no se configuró tal reserva en este caso; (3) que no procedieron de mala fe los demandantes recurridos al rechazar *749 el cambio de uso bajo consideración; (4) que no son terceros regístrales los esposos Redondo-Rivera, y (5) que no fueron temerarios los demandantes recurridos por demandar y mantener en el pleito a los doctores Lastra.(15) Consolida *750 mos las tres peticiones de certiorari y expedimos los autos solicitados mediante nuestra Resolución de 27 de enero de 2006. Al cabo de varios trámites procesales, las partes comparecieron y el caso quedó sometido.
rH I—I
La controversia de marras se refiere a la interpretación, validez y exigibilidad de ciertas disposiciones contenidas en la Escritura Matriz del Condominio Torre del Auxilio Mutuo. Conviene reproducir detalladamente las mismas.
Los usos de las distintas áreas del Condominio se establecen en el párrafo 5 de la Escritura Matriz. Éste dispone, en lo pertinente:
QUINTO: La Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico, Inc. ha decidido construir en una parcela de su propiedad descrita en el inciso PRIMERO de esta escritura, el edificio en Condominio TORRE DEL AUXILIO MUTUO para uso exclusivo de oficinas médico-dentales a ser vendidas a profesionales de la salud de la Facultad Médica del Hospital Auxilio Mutuo y reteniendo y operando para sí las áreas comerciales y/o de servicios médico-hospitalarios de los Pisos Uno y Tres para dedicarlos a, entré otros, laboratorios clínicos, unidad de endoscopía, radiología e imágenes, farmacia, banco, cafeterías y otros. Todo esto con el propósito fundamental de fortalecer y ampliar los servicios ambulatorios que ofrece actualmente dicho Hospital a sus socios y a la población en general. Por ello se destinan todas las oficinas del Edificio para ser usadas exclusivamente como oficinas de profesionales relacionados con la salud, con excepción del Primer Piso y el Tercer Piso que los retendrá para s[í] la Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico, Inc. para dedicarlos a usos comerciales y/o de servicios médico-hospitalarios y usos accesorios a éstos. A continuación se enumeran todas y cada una de las oficinas del Edificio y las áreas de los pisos Uno y Tres por sus usos a los cuales serán dedicadas .... (Énfasis nuestro.) Apéndice I, pág. 616.
La Oficina 518 quedó asignada al uso de otorrinolaringología. Apéndice I, págs. 616-619.
*751 El párrafo 27 también atiende extensamente los usos de las oficinas. Reza así su inciso (a):
Habiéndose construido este Edificio esencialmente para médicos, dentistas y profesionales de la salud, en cumplimiento con la Ley de Propiedad Horizontal de Puerto Rico, según enmendada, se establecen, clara y específicamente en esta Escritura, los usos a los cuales será destinada cada unidad u oficina, según el listado que detalla y se enumera en esta Escritura en la Cláusula QUINTO. En el futuro, luego de realizada la individualización y primera venta de la unidad u oficina, solamente podrá el comprador que adquiera el título de la unidad u oficina o su sucesor, arrendatario o cesionario, usar la unidad u oficina única y exclusivamente para el uso o usos señalados en la Cláusula QUINTO de esta Escritura. Solamente se podrá variar el uso o los usos específicos a los que se destinó la unidad u oficina:
(1) cuando sea para una práctica de la profesión médico o dental no cubierta en la Cláusula QUINTO de esta Escritura; (2) cuando el titular de la unidad previamente requiera y obtenga el consentimiento unánime por escrito de los condómin[o]es, según dispuesto en el ordenamiento legal vigente, para variar el uso o los usos señalados en la Cláusula QUINTO para la unidad u oficina. (Enfasis nuestro.) Apéndice I, pág. 735.
El esquema establecido en el párrafo 27(b) para la venta de oficinas también incide sobre el uso de éstas:
(b) Cuando se fuere a traspasar la titularidad por cualquier forma, se debe seguir el estricto orden:
1. El titular o sus herederos tasarán la propiedad a través de un profesional acreditado para ello.
2. Notificarán por correo certificado con acuse de recibo a la Administración del Condominio con el precio de venta según tasación que se acompaña.
3. La Administración notificará inmediatamente al Consejo de Titulares y a todas las partes interesadas de la oferta de venta y quienes a su vez tendrán sesenta (60) días a partir de la fecha de la notificación de la Administración para contestar por escrito a éstos su aceptación de comprar la oficina por el precio tasado.
4. Tendrán preferencia en la compra de la oficina en el siguiente orden:
a) Los titulares de la misma práctica profesional para dedicarla al mismo uso del que la adquiere.
b) En su ausencia los demás titulares para dedicarla al uso al cual ellos dedican la suya en el Condominio.
*752 c) En su ausencia la Sociedad Española de Auxilio Mutuo y Beneficiencia de Puerto Rico Inc., quien es también titular para dedicarla al uso para el cual el vendedor la utilizaba.
d) En su ausencia cualquier profesional [de la Facultad Médica del Hospital Auxilio Mutuo para dedicarla al uso para el cual está acreditado el comprador a ejercer su profesión.]
e) ....
f) En su ausencia después de transcurrir los sesenta (60) días del aviso de la Administración, sin recibirse contestación de los interesados, podrá vender el titular o sus herederos, por el precio que estimen razonable, a cualquier profesional de la salud acreditado en el país para ejercer su práctica profesional en el campo médico-dental. Apéndice I, págs. 736-737.
El párrafo 27(e) establece, a su vez, que un titular podrá incorporar permanentemente al uso de su oficina aquella subespecialidad cuya futura práctica se le autorice mediante la debida preparación académica y aprobación gubernamental. Apéndice I, pág. 738.
Por otro lado, sendas cláusulas de la Escritura Matriz exigen el estricto cumplimiento con las normas del Condominio,(16) y las Escrituras 158 y 530 contienen un texto similar al párrafo 27 de la Escritura Matriz. Apéndice I, págs. 773-776 y 800-805.
HH HH HH
Los recursos de epígrafe presentan cuatro preguntas medulares. ¿Cuál es la ley aplicable a este caso? Según dicha ley, ¿hubo una restricción de uso con respecto a la Oficina 518? Si la hubo, ¿existe una reserva lícita del derecho de variar tal uso? Si no existe, ¿procedieron con mala fe los demandantes recurridos al objetar el cambio de uso *753 propuesto para la Oficina 518? Emprendemos el análisis de la normativa jurídica, comenzando, en esta sección, con la interrogante sobre cuál es la ley aplicable.
A. Erase una vez la Ley de Propiedad Horizontal,(17) Ley Núm. 104. Ésta fue objeto de varias enmiendas a través de los años, hasta que se aprobó la Ley Núm. 103 de 5 de abril de 2003 (Ley Núm. 103), cuyas disposiciones modificaron sustancialmente la Ley de Propiedad Horizontal y la denominaron “Ley de Condominios”. El nuevo estatuto entró en vigor 90 días a partir de su aprobación, es decir, el 4 de julio de 2003. Aplica a todo inmueble sometido al régimen de propiedad horizontal, “cualquiera que sea el momento en que fuera sometido a dicho régimen”. Art. 44 de la Ley Núm. 103.(18) Ello significa que la Ley Núm. 103 tiene efecto retroactivo. Consejo Titulares v. Williams Hospitality, 168 D.P.R. 101 (2006).
Claro está, la retroactividad de la Ley Núm. 103 no debe menoscabar los derechos adquiridos bajo una legislación anterior, dado el Artículo 3 de nuestro Código Civil, 31 L.P.R.A. see. 3. Así lo entendimos en Consejo Titulares v. Williams Hospitality, supra, pág. 109, donde tuvimos la oportunidad de examinar el concepto “derecho adquirido”:
... el derecho adquirido no puede ser el conjunto de facultades que la ley anterior permitía que los ciudadanos ejercitaran, ya que esto sería el estado de derecho objetivo que la nueva ley intenta cambiar. El derecho adquirido, en cambio, es una situación consumada, en la que las partes afectadas descansaron en el estado de derecho que regía al amparo de la ley anterior. Así, los tratadistas distinguen entre la mera expectativa del derecho y los derechos adquiridos que ya entraron en el patrimonio de los sujetos involucrados.
Surge de nuestra Opinión en Williams Hospitality, por ejemplo, que la adquisición del dominio al palio de la ley anterior es un derecho adquirido, mas no las facultades *754 constitutivas de ese derecho. Igualmente, una decisión del Consejo de Titulares aprobada antes de entrar en vigor la Ley Núm. 103 resulta inmune al planteamiento de que su aprobación incumplió los nuevos requisitos procesales, así como la derrota de una propuesta resulta inmune al planteamiento de que se cumplieron esos requisitos.
Podemos concluir, entonces, que la Ley de Condominios aplica prospectiva y retroactivamente a todos los inmuebles sometidos al régimen de propiedad horizontal. La antigua Ley de Propiedad Horizontal aplica, a modo de excepción, sólo en cuanto la controversia trabada derive de hechos acaecidos durante su vigencia y que configuren un derecho adquirido. La opinión mayoritaria concluye, sin más, que aplica a esta controversia la Ley Núm. 104 por ser “la ley vigente al momento de los hechos” (énfasis en original) pág. 17, obviando el lenguaje expreso de la Ley Núm. 103 en el sentido que ésta aplica a todo inmueble sometido al régimen de propiedad horizontal, “cualquiera que sea el momento en que fuera sometido a dicho régimen”. Art. 44 de Ley Núm. 103 (31 L.P.R.A. sec. 1291 n). Es decir, que la Ley Núm. 103 tiene efecto retroactivo. Además, la opinión mayoritaria descarta el análisis que sobre este particular hicimos recientemente en Consejo Titulares v. Williams Hospitality, supra. En este sentido, la conclusión de la Mayoría es en todo punto incompatible con nuestro reciente dictamen en Williams Hospitality, supra.(19)
B. Veamos ahora cómo han variado los preceptos per *755 tinentes de nuestra legislación. La Ley de Condominios contiene sus principales disposiciones sobre el uso asignado a cada apartamiento en los Artículos 2, 15(a) y 22(d). Dispone el primer artículo, en lo relevante:
La escritura que establezca el régimen de propiedad horizontal expresará clara y precisamente el destino y uso de toda área comprendida en el inmueble, y, excepto que este capítulo autorice lo contrario, una vez fijado dicho destino y uso sólo podrá ser variado mediante el consentimiento unánime de los titulares. 31 L.P.R.A. see. 1291.
El texto vigente antes de entrar en vigor la Ley Núm. 103 era similar, mas no incluía el cualificativo “excepto que este capítulo autorice lo contrario ...”. 31 L.P.R.A. sec. 1291.(20) Por otro lado, no ha variado el texto pertinente de los Artículos 15 y 22 (31 L.P.R.A. secs. 1291 y 1292). Establecen éstos, respectivamente, que cada apartamiento se dedicará sólo al uso pautado en la escritura matriz (31 L.P.R.A. sec. 1291m(a)) y que ésta debe indicar claramente el “destino dado al inmueble y a cada uno de sus apartamientos” (31 L.P.R.A. sec. 1292(d)).(21)
Ahora bien, la Ley Núm. 103 incorpora al régimen una disposición especial relativa al cambio de uso de las áreas o locales comerciales o profesionales. Dispone el inciso (d) del Artículo 38 de la Ley de Condominios, inter alia:
En los condominios exclusivamente comerciales o profesionales, las dos terceras partes (2/3) de los titulares, que a su vez, reúnan las dos terceras partes (2/3) de las participaciones en los elementos comunes del inmueble, podrán aprobar las obras de mejora[s] que estimen pertinentes, sin que para ello tenga que estar disponibl[e] el dinero en el fondo de reserva que se establece en [este Artículo]. Por igual número de votos, podrá *756 variarse el uso fijado a un área o a un local comercial o profesional, si así lo autoriza la escritura matriz. 31 L.P.R.A. see. 1293b(d)(3).
En cuanto al principio de la buena fe se refiere, la Ley Núm. 103 añadió varias disposiciones que pretenden aclarar su operación en el condominio. Hemos reconocido que se trata de un principio cuyos dictámenes permean todo el ordenamiento jurídico. Véase, e.g., Consejo v. Villa Edamorga, 161 D.P.R. 785 (2004). No obstante, la Ley de Condominios se ocupa de recalcar en su Artículo 1-A, in fine:
En el ejercicio y el reclamo de sus derechos, los titulares actuarán conforme a los principios de la buena fe, de la prohibición de ir en contra de sus propios actos y la del abuso del derecho. 31 L.P.R.A. see. 1291 n.
Se añaden a esta norma unas disposiciones que matizan la oposición del titular a ciertos acuerdos del Consejo de Titulares. Con respecto a los acuerdos que precisan unanimidad, dispone el inciso (d) del Artículo 38-C de la Ley de Condominios:
La oposición a un acuerdo que requiera unanimidad, deberá fundamentarse expresamente, bien en la asamblea o por escrito, según se dispone en el párrafo anterior, y en ningún caso podrá basarse en el capricho o en la mera invocación del derecho de propiedad. La oposición infundada se tendrá por no puesta. 31 L.P.R.A sec. 1293b-3(d).
IV
Antes vimos que los Artículos 2, 15 y 22 de la Ley de Condominios contienen tres preceptos: (1) la escritura matriz debe expresar clara y precisamente el uso de cada apartamiento, (2) éstos podrán dedicarse sólo al uso indicado, y (3) toda enmienda a dicha expresión exige el consentimiento unánime de los titulares. Es menester precisar el alcance de estas reglas con miras a la redacción, la estructura y el historial de nuestra Ley de Condominios.
*757 A. El régimen de propiedad horizontal se ha concebido en nuestro ordenamiento como una figura jurídica cuyo propósito inmediato es facilitar la propiedad individualizada de los espacios de un inmueble que son susceptibles de aprovechamiento individual y comparten determinados elementos del inmueble. Art. 1-A de la Ley de Condominios, 31 L.P.R.A. sec. 1291 n.; Asoc. Cond. Balcones S.Ma. v. Los Frailes, 154 D.P.R. 800, 814 (2001) (“la esencia de la horizontalidad ... [es] la coexistencia de diversos pisos de dominio exclusivo con el condominio forzoso e inescapable de elementos comunes”); Asoc. C. Quadrangle Med. Ctr. v. Ramírez, 154 D.P.R. 699, 707 (2001); Brown III v. J.D. Cond. Playa Grande, 154 D.P.R. 225, 231 (2001); Soto Vázquez v. Vázquez Torres, 138 D.P.R. 282, 289 (1995); Cond. Prof. S.J. H. Centre v. P.R.F., Inc., 133 D.P.R. 488, 489-490 (1993); Consejo Tit. Cond. McKinley Court v. Rullán, 126 D.P.R. 387, 393 (1990); Arce v. Caribbean Home Const. Corp., 108 D.P.R. 225, 235-236 (1978). En términos más ilustrativos, aunque menos precisos, se trata de transformar una estructura física en múltiples estructuras jurídicas, para que donde antes cabía un sólo dominio, ahora quepan varios. De esta forma, el legislador ha querido lidiar con la escasez de viviendas y con la ausencia de un urbanismo ajustado a nuestros recursos ambientales y económicos. Véanse: Brown III v. J.D. Cond. Playa Grande, supra; Álvarez Figueredo v. González Lamela, 138 D.P.R. 958, 965 (1995); Soto Vázquez v. Vázquez Torres, supra, págs. 288-289; Cond. Prof. S.J. H. Centre v. P.R.F., Inc., supra, pág. 490; Maldonado v. Consejo de Titulares, 111 D.P.R. 427, 429 (1981); Arce v. Caribbean Home Const. Corp., supra, págs. 236 y 241—243; Asoc. de Condóminos v. Naveira, 106 D.P.R. 88, 91 (1977).
Dado que la propiedad horizontal facilita el dominio individualizado sobre los distintos espacios de un inmueble, los cuales comparten ciertos elementos, es necesario un esquema normativo que armonice los distintos derechos dominicales. Este surge principalmente de la Ley de Con *758 dominios y de los documentos constitutivos del condominio, que son la escritura matriz y el reglamento.
1. Uno de los problemas medulares en el desarrollo de nuestra Ley de Condominios ha sido el de procurar un balance apropiado entre la flexibilidad del régimen y la protección de los titulares. Tal balance resulta imperativo en la consecución de un régimen capaz de resolver los problemas socioeconómicos que animan la horizontalidad. Veamos.
Antes de surgir la legislación especializada sobre propiedad horizontal, el Artículo 330 del Código Civil contenía las principales normas al respecto. 31 L.P.R.A. see. 1275. Éstas resultaron insuficientes y dieron paso a la Ley Núm. 104, cuya aprobación respondió a la necesidad de establecer “una mecánica más amplia, detallada y clara sobre la materia de apartamientos, o sea, de los pisos de que habla el referido artículo 330 del Código Civil según ha sido enmendado”. Informe de la Comisión de lo Jurídico Civil del Senado de Puerto Rico sobre el P. de la C. 181, 22 de mayo de 1958, X Diario de Sesiones de la Asamblea Legislativa (Ordinaria), T. 4, pág. 2004 (1958).(22) Empero, las múltiples lagunas de la Ley Núm. 104 aún ofrecían una amplia discreción a quienes organizaban el condominio y a los titulares en control del mismo.
Esa liberalidad figura entre los factores que produjeron las sustanciales enmiendas a la Ley de Propiedad Horizontal efectuadas mediante la Ley Núm. 157 de 4 de junio de 1976, cuya Exposición de Motivos indica el deseo de evitar los abusos y trastornos habidos en el condominio. Su historial legislativo sugiere, incluso, que uno de los principales cambios contemplados era establecer
... en detalle todo el ámbito de derechos y obligaciones de los *759 titulares en cuanto a uso y disfrute de sus apartamientos, co-bro de deudas por gastos comunes, incluyendo las acciones correspondientes en los tribunales. Informe Conjunto de las Comisiones de lo Jurídico Civil, Desarrollo Urbano y Vivienda y de Asuntos del Consumidor de la Cámara de Representantes sobre el R de la C. 1862 de 21 de abril de 1976, 7ma Asamblea Legislativa, 4ta Sesión Ordinaria, pág. 4.
Así se quiso procurar un balance más adecuado entre la flexibilidad del régimen y la protección del titular. Al cabo de varias décadas, la Ley de Condominios constituye otro esfuerzo por lograr ese balance adecuado, encaminado principalmente a flexibilizar el régimen. Concluye su Ex-posición de Motivos que dicha ley pretende “garantizar procesos más eficientes y justos que en última instancia serán de gran beneficio para toda nuestra comunidad”. 2003 Leyes de Puerto Rico 358. Véase, además, Consejo Titulares v. Williams Hospitality, supra.
Ahora bien, el historial de la Ley de Condominios revela una especial preocupación por atender ciertos intereses del titular residencial.(23) De ahí que la ley ofrezca determinadas garantías al titular residencial y las niegue a los titulares de condominios exclusivamente comerciales o profesionales.(24) Nuestro legislador parece entender que el balance adecuado entre la flexibilidad del régimen y la protección del titular es distinto en dichos condominios, ya sea porque las actividades comerciales y profesionales exigen mayor flexibilidad, porque esos titulares suelen proteger *760 sus intereses con más efectividad o porque sus intereses merecen menos protección.
2. Con respecto a la escritura matriz, hemos indicado que se trata de un estatuto privado al cual se adhieren los titulares, ya sea cuando someten el inmueble a la horizontalidad o cuando adquieren algún apartamiento. Cond. Prof. S.J. H. Centre v. P.R.F., Inc., supra, págs. 501-502; Consejo de Titulares v. Vargas, 101 D.P.R. 579, 582-583 (1973). Véase, también, Brown III v. J.D. Cond. Playa Grande, supra, págs. 234-235. Así, obtiene gran flexibilidad al régimen de propiedad horizontal, mediante la ordenación privada de los condominios.
Sin embargo, nuestro legislador ha reglamentado esta figura para ofrecer ciertas protecciones a los titulares. Se procura, por un lado, que la escritura matriz y el Registro de la Propiedad, unidos a las características perceptibles del inmueble, ofrezcan a los titulares una descripción adecuada y confiable del condominio. De ahí que las enmiendas a la escritura precisen el consentimiento unánime de los titulares y que sea ineludible expresar inequívocamente ciertas cuestiones.
Hemos reconocido, por otro lado, que la Ley de Condominios limita el contenido de la escritura matriz. Ciertamente, el texto estatutario no siempre aclara si las normas pautadas son imperativas o dispositivas. Pero hemos visto que el historial legislativo revela un intento de procurar el balance más apropiado entre la flexibilidad del régimen y la protección de los titulares, precisamente, contra los efectos de tal flexibilidad. Como el uso de los apartamientos es un elemento importante del derecho relativo a los condominios, su reglamentación incide poderosamente sobre el susodicho balance legislativo. Ello nos convence de que la tendencia en nuestra legislación ha sido la de pautar nor-mas que limiten el contenido de la escritura matriz en cuanto al uso de los apartamientos.
Lo anterior explica nuestra actitud desfavorable hacia las reservas de derechos efectuadas en la escritura matriz. *761 En Álvarez Figueredo v. González Lamela, supra, resolvimos que el Consejo de Titulares puede autorizar una sobreelevación privativa, cumplido el requisito de unanimidad, pero ese derecho no es reservable. Explicamos que “[l]a prohibición de reservar el derecho de sobreelevación a favor de un particular no tiene otro propósito que proteger a los titulares de los desmanes negociadores del desarrollador o del titular inicial único del condominio”. íd., pág. 965. También, véase Consejo Tit. v. Galerías Ponceñas, Inc., 145 D.P.R. 315 (1998).
B. El recurso de epígrafe nos convida a examinar los Artículos 2, 15 y 22 en un contexto muy particular: el de las restricciones de uso contenidas en la escritura matriz de un condominio exclusivamente comercial o profesional.
Adviértase, por un lado, que las reglas pautadas en dichos artículos responden a tres imperativos distintos: primero, establecer el uso de las áreas comunes; segundo, indicar si los apartamientos son residenciales o comerciales; tercero, advertir sobre cualquier limitación adicional al uso de los apartamientos. La distinción es relevante a la hora de precisar la intención legislativa con respecto a los Artículos 2, 15 y 22. En el caso de los apartamientos, por ejemplo, obsérvese que la designación “residencial” o “comercial” es mandatoria,(25) mas no así las restricciones adicionales de uso. Nuestra Ley de Condominios exige una expresión en la escritura matriz con respecto al uso residencial o comercial de los apartamientos, y permite que la escritura matriz establezca otras limitaciones de uso. Soto Vázquez v. Vázquez Torres, supra, págs. 290-291; Cond. Prof. S.J. H. Centre v. P.R.F., Inc., supra, pág. 504.
Estas restricciones de uso, contenidas en la escritura matriz, limitan el dominio sobre los apartamientos. Por ende, hemos insistido en que su redacción sea clara y *762 precisa. Sólo de este modo se informa adecuadamente y sin ambigüedades el contenido de la norma a los titulares y demás interesados. Así mismo, hemos señalado que las restricciones de uso serán interpretadas estricta y restrictivamente.(26) Soto Vázquez v. Vázquez Torres, supra, págs. 290-291.
Por otro lado, conviene subrayar que nos enfrentamos a una controversia entre los titulares profesionales de un condominio exclusivamente comercial y profesional. He-mos visto cómo el historial de la Ley de Condominios re-vela que el balance adecuado entre la flexibilidad del régimen y la protección del titular se inclina hacia la flexibilidad en dichos condominios. Ello incide sobre nuestra apreciación de la intención legislativa con respecto a las restricciones de uso contenidas en la escritura matriz de un condominio exclusivamente comercial o profesional.
C. En el epicentro de esta controversia radica nuestra decisión en Cond. Prof. S.J. H. Centre v. P.R.F., Inc., supra.(27) Se trataba en aquel litigio de un condominio dedicado principalmente a ofrecer servicios de salud. La escritura matriz disponía que ciertas unidades se dedicarían exclusivamente al uso de oficina médica. Otras unidades, cuyo título retuvo el desarrollador, se dedicarían a varios usos específicos. Ahora, el reglamento del condominio especificaba el uso de cada oficina médica e indicaba que el propósito era garantizar a cada titular la exclusividad de su práctica especializada en el condominio.
La controversia surgió cuando el desarrollador intentó variar el uso de la Oficina 701 para venderla, provocando *763 eventualmente una demanda de injunction del Consejo de Titulares. Ripostó el desarrollador que la cláusula 13(b) de la escritura matriz le permitía, entre otras cosas, “ Variar el uso y destino de los apartamientos y áreas del edificio que retenga y/o adquiera en el futuro’ ”. Cond. Prof. S.J. H. Centre v. P.R.F., Inc., supra, pág. 495. También invocó el Artículo 33(d) del Reglamento para la Operación y Administración del Condominio Profesional S.J.H.C., según el cual todo cambio de uso de las oficinas exigía el consentimiento expreso y escrito del desarrollador y del titular de toda oficina dedicada a la nueva especialidad. Cuando el foro primario declaró nulas ambas disposiciones y concedió el injunction solicitado, el desarrollador acudió sin éxito ante nosotros.
La opinión de este Tribunal consideró tres asuntos pertinentes al caso de autos.(28) Primero se discute si la reserva del desarrollador en la escritura matriz era válida. Al respecto indicamos allí que “retener el derecho a variar unilateralmente el uso de los apartamientos” era contrario a la Ley de Propiedad Horizontal y, por ende, “[n]o erró el foro de instancia al decretar la nulidad de la referida cláusula ...”. (Énfasis en el original.) Cond. Prof. S.J. H. Centre v. P.R.F., Inc., supra, pág. 503. Luego se discute si los hechos del caso configuraban un cambio del uso asignado en la escritura. Al contestar en la afirmativa, indicamos que dicho uso puede ser de carácter general (e.g., “uso comercial”) y que puede especificarse mediante el reglamento.(29) *764 También enfatizamos que el reglamento del condominio garantizaba a los titulares la exclusividad, garantía que fue determinante en la voluntad de los demandantes al adquirir sus apartamientos. Por último, examinamos si era válido el Artículo 33(d) del mencionado reglamento, el cual consideramos nulo por infringir el Artículo 37 de la Ley de Propiedad Horizontal, 31 L.P.R.A. sec. 1293a, disposición que atendía la modificación del reglamento.
El anterior resumen nos permite apreciar un silencio en el análisis de Cond. Prof. S.J. H. Centre.(30) Allí indicamos que las restricciones de uso son opcionales y no deben enumerarse necesariamente en la escritura matriz. Luego resolvimos que la reserva del derecho de variar un uso es contraria a la Ley de Propiedad Horizontal. Surge entonces la pregunta: si el desarrollador de un condominio no está obligado a limitar el uso de los apartamientos, ¿por qué negarle la opción de establecer una restricción sujeta a determinadas condiciones o reservas? El texto estatutario no ofrece una respuesta adecuada a dicha pregunta.(31)
La respuesta resulta evidente a poco reflexionamos so *765 bre los hechos de Cond. Prof. S.J. H. Centre. La reserva invocada era incondicional y unilateral. Al ser incondicional, soslayaba totalmente uno de los principios de nuestro régimen de condominios, viz., que la escritura matriz y el Registro de la Propiedad, unidos a las características perceptibles del inmueble, ofrezcan a los futuros titulares una descripción adecuada y confiable del condominio. Al ser unilateral e incondicional, la cláusula dejaba de ofrecer la protección que nuestro legislador había establecido en cuanto a las restricciones de uso contenidas en el reglamento. Tales circunstancias hicieron innecesario que examináramos la validez de otras reservas y condiciones.
Discrepamos igualmente del análisis hecho por la mayoría de nuestro dictamen en Cond. Prof. S.J. H. Centre, pues allí no se resolvió la controversia planteada en este caso. Este asunto quedó sobre el tapete en aquella ocasión.
D. La controversia de autos nos presenta una situación fáctica más compleja y delicada que la de Cond. Prof. S.J. H. Centre, lo cual nos obliga a emprender la tarea allí pendiente. El criterio rector de nuestro análisis es procurar aquellas reglas capaces de lograr el balance más adecuado de los principios colegidos del historial legislativo, ya resaltadas: facilitar la flexibilidad del condominio, ofrecen una garantía a los titulares con relación a las características de su derecho sobre condominios, y proteger determinados intereses contra los efectos de la organización privada del condominio.
Antes bien, observamos que las restricciones de uso presentan un dilema para los desarrolladores. Por un lado, tales restricciones tienen el potencial de producir un condominio más atractivo para quienes desean, por ejemplo, alguna garantía contra la presencia de ciertas actividades en el condominio. Además, las restricciones de uso benefician a todos los condominos en la medida que disminuyen las pugnas internas con respecto al uso de los apartamientos. Por otro lado, un régimen de usos limitados carece de flexibilidad, tanto para el desarrollador como *766 para los titulares, lo cual acarrea pérdidas económicas y hedónicas. Ello se debe a que las restricciones contenidas en la escritura matriz sólo podrán variarse con el consentimiento unánime de los condominos; las que se incorporan al reglamento, con el consentimiento de dos terceras partes de los titulares y las participaciones.(32)
El problema reseñado admite solución mediante las cláusulas cuyo ejercicio o cumplimiento afecta el contenido o eficacia de las restricciones de uso. Ciertamente, estos mecanismos son capaces de soslayar uno de los principios medulares de nuestro régimen, viz., que la escritura matriz y el Registro de la Propiedad, unidos a las características perceptibles del inmueble, deben ofrecer una descripción adecuada y confiable del condominio. Pero dicha garantía no es absoluta. Por ejemplo, el titular que descansa en una limitación de uso contenida en el reglamento habrá de tener presente que ésta podría enmendarse con el consentimiento de dos terceras partes de los titulares y las participaciones. Somos del criterio, pues, que nuestro legislador no ha rechazado la posibilidad de una reserva o condición que brinde suficiente seguridad al titular con respecto al uso de los apartamientos.
La seguridad aludida puede surgir de tres modos. En primer lugar, es posible redactar una restricción de uso que incorpore cierta flexibilidad en la descripción del uso. Tal sería el caso, por ejemplo, de una cláusula para establecer que el apartamiento 1-A será dedicado al negocio de restaurante japonés o de cualquier especialidad culinaria que no estuviera representada en el condominio, según su escritura matriz. Aquí la restricción es clara y precisa, pues basta con examinar dicha escritura para determinar cuáles son los usos permitidos.
*767 En segundo lugar, es posible que la reserva cumpla el quantum mínimo que ha pautado la ley para los cambios de uso en condominios comerciales o profesionales, o sea, el de dos terceras partes de los titulares y las participaciones. La escritura matriz podría establecer, por ejemplo, que el apartamiento 1-A se dedicará al negocio de restaurant, a menos que el 90% de los condominos y las participaciones autoricen un cambio de uso.
Por último, es posible que se trate de una restricción de uso sujeta a determinada condición resolutoria o modificativa, siempre que ésta no sea rigurosamente potestativa. Ejemplo de ello sería la disposición de que el apartamiento 1-A habrá de utilizarse para el negocio de taberna, a no ser que se denieguen los permisos pertinentes, en cuyo caso se dedicará a cualquier uso comercial o profesional. Aquí los titulares y demás interesados no pueden precisar con certeza el uso que tendrá dicho local. Sin embargo, la escritura matriz les ofrece unos criterios relativamente objetivos para determinar si asumen el riesgo, ya que la discreción del titular está condicionada a la denegación de cierto permiso.
Las características reseñadas garantizan, además, un nivel adecuado de protección a los titulares comerciales o profesionales. Estos suelen contar con el incentivo y la capacidad para examinar cuidadosamente los documentos constitutivos del condominio. Siempre que la reserva o condición surja clara y precisamente de éstos, tal como debe surgir la correspondiente restricción de uso, según Soto Vázquez v. Vázquez Tores, supra, es de presumir que ésta formará parte del juicio comercial. Dicho análisis será más factible en la medida que hayamos eliminado la discreción del reservista. Nada sugiere que el legislador haya contemplado una mayor protección de los titulares comerciales o profesionales.
Muy distinto es el panorama cuando se trata de una reserva, estrictamente hablando, o de una condición rigurosamente potestativa. Aquí los titulares y demás interesados carecen de una base adecuada para asumir o recha *768 zar el riesgo (a no ser que sepan la intención del titular o sean indiferentes al uso). Incluso, estas cláusulas son ca-paces de brindar incentivos perversos al desarrollador. Cierto comentarista nos ofrece un ejemplo ilustrador, en el contexto de las urbanizaciones residenciales y sus condiciones restrictivas:
However, the homeowners could have interests that strongly diverge from the developer and they could be the losers with amendment and modification power being retained by the developer. For example, the Company could theoretically market the bulk of the residential lots, then release the covenants on the remaining land and sell to commercial users. Commercial entities would pay a premium price to the Company to be one of the few businesses surrounded by many residential customers (a quasi-monopoly position). Thus the Company may have an incentive to release or modify the covenants even though the homeowners would object to introduction of commercial uses in their residential community. During the early stages of marketing the subdivision, the Company might be unlikely to so frustrate owner expectations since that would hurt its attempts to sell lots to other customers; but in the latter stages of the development, that market constraint would be reduced. (Escolio omitido.) G. Corngold, The Emergence of Private Land Use Controls in Large-Scale Subdivisions: The Companion Story to Village of Euclid v. Ambler Realty Co., 51 (Núm. 4) Case W. Res. L. Rev. 617, 631—632 (2001).
E. Con el fin de precisar la norma antes pautada y su fundamento, conviene examinar una de las posturas que asume la SEAM en su alegato. Ésta nos invita a resolver que son válidas las reservas razonables e inválidas las irrazonables. Hemos visto como la Ley de Condominios procura establecer un balance apropiado de la flexibilidad del régimen y la protección de los titulares. La SEAM arguye, esencialmente, que las reservas razonables armonizan con dicho criterio, ya que responden a los intereses legítimos del desarrollador y constan en la Escritura Matriz.
Sin duda que el criterio de razonabilidad figura entre los factores pertinentes a la hora de evaluar una reserva o condición. Nuestra Ley de Condominios está matizada por *769 el principio de la buena fe, principio que, evidentemente, milita contra una disposición irrazonable de su faz o en su aplicación. Y debemos reconocer que el criterio de razonabilidad podría afectar el desarrollo de las reglas aquí pautadas. De hecho, alguna distinción entre las reservas razonables e irrazonables ha venido a ser una solución muy acogida en el contexto de los convenios restrictivos estadounidenses.(33) Algunos tribunales han aplicado dicha norma a los condominios(34) y las restricciones de uso condominales se evalúan frecuentemente con miras al criterio de razonabilidad.(35)
No podemos convenir con la SEAM, sin embargo, *770 cuando sostiene que todo gira en torno a si las reservas son razonables o irrazonables. Esa postura deja de apreciar la necesidad de ofrecer una garantía adecuada con respecto a las características del derecho de condominios y de proteger a los titulares contra los desmanes negociadores de quien establece el condominio. Aquí nuestra legislación se aparta de aquellas jurisdicciones estadounidenses que han optado por un régimen más flexible.(36) Consecuentemente, procuramos establecer unos requisitos capaces de reducir la incertidumbre, el costo y los inconvenientes incidentales a la determinación judicial o administrativa sobre razonabilidad.
V
Los peticionarios invocan el principio de la buena fe para sostener que procede desatender la oposición de los demandantes recurridos al cambio de uso en controversia.(37) Este principio, ubicuo en nuestro ordenamiento, admite múltiples definiciones y aplicaciones que matizan tanto la Ley de Condominios como la Ley de Propiedad Horizontal. Veamos la modalidad más pertinente el caso de autos.
Anteriormente indicamos que la Ley de Condominios incluye varias disposiciones encaminadas a precisar los imperativos de la buena fe entre condominos. Entre ellas fi *771 gura el Artículo 38-C(d), supra, sobre la oposición a los acuerdos del Consejo de Titulares que requieren unanimidad. Dispone dicho artículo que la oposición “deberá fundamentarse expresamente, bien en la asamblea o por escrito, según se dispone en el párrafo anterior, y en ningún caso podrá basarse en el capricho o en la mera invocación del derecho de propiedad. La oposición infundada se tendrá por no puesta”. 31 L.P.R.A. sec. 1293b-3(d).
Al reflexionar sobre este precepto, colegimos que establece dos reglas. La primera es que resulta inaceptable la oposición del titular cuya postura esté motivada exclusivamente por el capricho, el encono, la animadversión o la mera potestad. En segundo lugar, resulta inadecuada la oposición del titular que falte al deber de fundamentarla expresamente a través de los mecanismos indicados. Como remedio, en ambos casos, la oposición se tendrá por no puesta.
La primera de estas reglas es un corolario del principio de la buena fe. Cualesquiera que sean sus dictámenes particulares, ese principio se nutre de un postulado ético que nos exige alguna razón suficiente para perjudicar el bienestar de otra persona y que rechaza las razones fundadas en el deseo de causar o retribuir un daño, en la prepotencia y en la indiferencia. Quien se opone a un acuerdo del Consejo de Titulares, sin existir más razón que las indicadas, incumple con ese imperativo y obra de mala fe. Como ex-presamos en Asoc. C. Quadrangle Med. Ctr. v. Ramírez, 154 D.P.R. 699, 712 esc. 5 (2001), “la negativa de un titular en aquellos casos donde se requiere consentimiento unánime no puede ser arbitraria y caprichosa”. También he-mos indicado que abusan del derecho y proceden con mala fe los titulares cuya oposición responde al empeño de incumplir con sus obligaciones como condominos. Consejo Tit. v. Galerías Ponceñas, supra, págs. 340-341.
Falta por identificar el remedio apropiado cuando algún condomino se opone indebidamente —según el principio de la buena fe— a un acuerdo que precisa unanimidad. Resulta ineludible concluir que los foros judiciales y adminis *772 trativos están facultados para desatender la oposición y confirmar el acuerdo retroactivamente.(38) Es un postulado de nuestro ordenamiento el que procura evitar los frutos de la mala fe.(39) Cuando un titular se opone a los acuerdos del Consejo de Titulares que precisan de unanimidad, se minimizan los beneficios de su conducta con un tachazo. En Consejo Tit. v. Galerías Ponceñas, Inc., supra,(40) determinamos que se podía excluir de ciertas decisiones al titular mayoritario incurso en un claro abuso del derecho. Por supuesto, habrá circunstancias en las cuales será inapropiado tachar la oposición ilícita, como, por ejemplo, cuando la verificación tardía del acuerdo perjudicará los intereses de terceros inocentes. Y se debe recordar que el principio de la buena fe está atado a una presunción de buena fe. Véanse, e.g.: McConnell v. Palau, 161 D.P.R. 734 (2004); B.W.A.C. Int’l v. Quasar Co., 138 D.P.R. 60, 71 esc. 8 (1995); Citibank v. Dependable Ins. Co., Inc., 121 D.P.R. 503, 519 esc. 11 (1988); Cervecería Corona v. Commonwealth Ins. Co., 115 D.P.R. 345, 351 (1984) (“La buena fe se presume. Quien reclama la mala fe debe probarla”).
*773 VI
Al inicio de la sección III indicamos las cuatro preguntas medulares en este caso. ¿Cuál es la ley aplicable? Según dicha ley, ¿hubo una restricción de uso con respecto a la Oficina 518? Si la hubo, ¿existe una reserva lícita del derecho a variar tal uso? Si no existe, ¿procedieron de mala fe los demandantes recurridos al rechazar el cambio de uso propuesto?
A. La Ley de Condominios aplica prospectiva y retroactivamente a todos los inmuebles sometidos al régimen de propiedad horizontal, pero la Ley de Propiedad Horizontal rige las controversias derivadas de hechos acaecidos durante su vigencia que configuran un derecho adquirido. Las circunstancias de este caso cumplen ambos requisitos, ya que la putativa derrota del acuerdo entre condominos ocurrió antes del 4 de julio de 2003, y tal suceso constituye un derecho adquirido. Valga recalcar, sin embargo, que la Ley de Propiedad Horizontal está matizada por el principio de la buena fe.
B. Veamos si la Escritura Matriz configura una restricción de uso sobre la Oficina 518 y una reserva lícita a favor de la SEAM.
A pesar de su complicada redacción, es posible resumir el contenido medular de la Escritura Matriz. El párrafo 5 establece que las oficinas se dedican exclusivamente a la prestación de servicios profesionales relacionados con la salud, que toda oficina tiene un uso específico al cual será dedicada y que el uso específico de la Oficina 518 es el de otorrinolaringología. El párrafo 27(a) reitera estas expresiones al señalar que “se establecen, clara y específicamente en esta Escritura, los usos a los cuales será destinada cada unidad u oficina, según listado que detalla y se enumera en esta Escritura en la Cláusula QUINTO”. Apéndice I, pág. 735.
Acto seguido, el párrafo 27 añade dos cosas: (1) “[e]n el *774 futuro, luego de realizada la individualización y primera venta de la unidad u oficina, solamente podrá el comprador ... usar la unidad u oficina única y exclusivamente para el uso o usos señalados en la Cláusula QUINTO de esta Escritura” (Apéndice I, pág. 735); (2) tal uso podrá variarse sólo cuando el titular obtenga el consentimiento escrito y unánime de los condominos o “cuando sea para una práctica de la profesión médico o dental no cubierta en la Cláusula QUINTO de esta Escritura ...”. íd. Igualmente, hemos visto que los párrafos 27(c) y 27(e) permiten un cambio de uso cuando el comprador elegible —según la prelación establecida— ejerza otra especialidad o cuando el titular procure una subespecialidad (e.g., de medicina interna a cardiología).
Según las disposiciones reseñadas, no cabe duda que la Escritura Matriz establece una restricción de uso. Más allá de su destino comercial-profesional, la Oficina 518 está limitada a la especialidad médica de otorrinolaringología u otra ausente del párrafo 5. Por supuesto, dicha restricción está sujeta a varias condiciones modificativas, relacionadas con la reventa del apartamiento y las futuras subespecialidades del titular. Pero dichas condiciones no desvirtúan el tenor claro del párrafo 5 de la Escritura Matriz.(41)
Los peticionarios sostienen, sin embargo, que el párrafo 27(a) establece una reserva a favor de la SEAM para variar el uso de las oficinas antes de su primera venta. Somos del criterio que la disposición invocada dista muchísimo del lenguaje capaz de constituir una reserva o condición exigible.(42) Ciertamente, el Tribunal de Primera Instancia *775 estimó probado que las partes tuvieron la intención de establecer una reserva. Pero el requisito de forma se dirige, precisamente, a circunscribir la discreción del juzgador. Toda reserva o condición debe surgir inequívocamente de la escritura matriz.
Los vicios de la putativa reserva superan su obscuridad. Interpretada literalmente, ésta facultó a la SEAM para variar el uso de cada oficina antes de su primera venta. No se trata, evidentemente, de una disposición compatible con el quantum decisional aplicable. Tampoco se trata de una definición del uso asignado. Estamos ante una reserva sujeta a la única condición de que el desarrollador no podría vender el apartamiento, readquirirlo y, luego, cambiar su uso. La SEAM aduce con verosimilitud que el propósito de esta disposición era facilitar la venta de aquellas oficinas cuya especialidad asignada no tuviese acogida. Sin embargo, el párrafo 27(c) de la Escritura Matriz demuestra que era posible redactar una disposición ajustada a tal propósito. La SEAM optó por no limitar su discreción. En fin, la putativa reserva del párrafo 27(a) es inválida por no tener alguna de las tres características que hemos reseñado.(43)
C. Habiéndose resuelto que la Oficina 518 está sujeta a una restricción de uso y que no existe la reserva invocada, es evidente que el cambio de uso impugnado estaba sujeto al requisito de unanimidad. Resta por determinar si los demandantes recurridos se opusieron adecuadamente a dicho cambio.
Aquí los peticionarios invocan el principio de la buena fe. Sostienen que la oposición del doctor Serrano Muñoz fue infundada y que frustró las expectativas legítimas que tenía la SEAM en su relación contractual con los demandantes recurridos. Estos aducen, en cambio, que su oposi *776 ción respondió principalmente a dos consideraciones. Por un lado, deseaban evitar la competencia que implica una mega práctica de cardiología. Se arguye, en otras palabras, que los doctores Redondo y Lastra podrían unir las Oficinas 516 y 518, lo cual les permitiría establecer un consultorio con facilidades más atractivas y con el beneficio de un laboratorio privado. Por otro lado, los demandantes recurridos invocan su interés económico en limitar el número de oficinas dedicadas a la cardiología, especialmente cuando la SEAM les dio a entender que sólo habría cinco de tales oficinas. Alegato de la parte recurrida, págs. 10-11.
1. Es menester comenzar con ciertas observaciones de carácter procesal. Los demandantes recurridos solicitan un injunction para limitar el uso de la Oficina 518 a la otorrinolaringología. Tal causa de acción exige prueba de que: (1) la Oficina 518 está limitada al referido uso, (2) éste se ha variado, y (3) no se observaron los requisitos pertinentes para ello. Los demandantes recurridos probaron hechos tendientes a establecer la restricción y el cambio de uso. Con respecto al tercer punto, hemos visto que dicho cambio estaba sujeto al criterio de unanimidad, matizado por el principio de la buena fe. La cuestión ahora planteada es si los demandantes probaron su buena fe. Claro, tratándose del referido principio general, éstos disfrutan una presunción de buena fe.(44) La pregunta a dirimir, entonces, es si la prueba estableció preponderantemente los hechos constitutivos de mala fe.
A dicha pregunta nos enfrentamos con la acostumbrada deferencia hacia las determinaciones fácticas del Tribunal de Primera Instancia. Estas deben prevalecer en la medida *777 que reflejen su apreciación de la prueba testifical y no existan circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto. La prueba documental, en cambio, es susceptible de una evaluación independiente por parte de este Tribunal, encaminada a determinar si dicha prueba suscita una convicción firme y definitiva de que erró el juzgador en su apreciación. Igual deferencia observamos cuando se impone la necesidad de hacer un balance entre la prueba testifical y la documental. Véanse, e.g.: Gallardo v. Petiton y V.T.N., Inc., 132 D.P.R. 39, 56 (1992); Abudo Servera v. A.T.P.R., 105 D.P.R. 728, 731 (1977); Fernández v. Hosp. Gen. San Carlos, Inc., 113 D.P.R. 761, 773 (1983).
2. La Sentencia del Tribunal de Primera Instancia determinó que los demandantes recurridos objetaron el cam-bio de uso de la Oficina 518 porque decidieron oponerse a cualquier cambio de uso. Dicho foro tuvo ante sí el testimonio de ambos demandantes, quienes hicieron referencia al problema de la “mega-práctica” y a su interés económico en controlar el número de oficinas de cardiología. Sin embargo, el foro primario expresó en sus determinaciones de hechos:
Los demandantes se opusieron mediante carta del 20 de junio de 2002, dirigida al señor Quiñoy en la que escuetamente indicaron su oposición al cambio de uso propuesto para la oficina 518. No ofrecieron fundamentos para su oposición. Surge así mismo de la prueba, que el doctor Serrano se ha opuesto a otros cambios de uso de primera venta aunque nada tenían que ver con su especialidad. En específico, los demandantes no se habían opuesto anteriormente en el 2001 al cambio de especialidad de la oficina número 509 para cirugía de colon y recto, pero posteriormente decidieron oponerse, sin dar razón alguna. Declaró el doctor Serrano que se hubiera opuesto a cualquier cambio de oficina, incluso si meramente se tratara de un trueque de ubicación aunque con ello no se afectara el número de oficinas dedicadas a cardiología ni se afectara su práctica. Sentencia TPI, Apéndice I, págs. 959-960.
*778 Nos corresponde examinar si esta apreciación es claramente errónea, según los criterios antes indicados. La prueba testifical pertinente contiene declaraciones que tienden a confirmarla. Su mejor ejemplo surge del contrainterrogatorio que realizó el licenciado Godreau al doctor Serrano Muñoz:
P ... Doctor, dígame si es o no cierto que usted actualmente se opone a cualquier tipo de cambio que se haga de uso específico de una oficina en la Torre de Auxilio Mutuo .... Usted, incluso, se opone a un trueque de ubicación.
R Es correcto. Y me opongo ... porque hay un precedente previo ... y hubo una oposición ....
P Fíjese, doctor, esa no es la pregunta.
R ... y se respetó ...
P La pregunta no es esa, doctor, la pregunta es si usted ahora mismo se opone a cualquier trueque.
R ¿Trueques ... a los trueques? Me opongo a cualquier trueque.
P Okay. O sea, ¿aunque no se afecte el número de oficinas de Cardiología?
R Aunque no se ... afecte el número de oficinas porque estas oficinas tiene cada una un uso y para cambiar ese uso hay un procedimiento.
P Doctor, ¿y en qué forma le afecta a usted el trueque ... si al fin y al cabo queda el mismo número de oficinas de Cardiología y queda el mismo número de oficinas de la otra especialidad? ....
R Hay una ley que hay que respetarla. Yo entiendo, y aquí se me hicieron ...
P No, no, no, la pregunta no es si hay que respetar la ley, ¿en que le afecta a usted directamente?
R Me afecta que se violen las restricciones establecidas ...
P ¿Perdón?
R Me afecta desde el punto de vista que se violan las restricciones establecidas para el condominio y que esto en el futuro, pues se puede prestar para que esto se modifique ... Yo no creo que, por ejemplo, un cardiólogo, que esté en el cuarto piso, le interesa que vengan cinco cardiólogos más a ese piso después. Y. ha habido ... digo, ese tipo de circunstancia puede ocurrir. (Énfasis nuestro.) Transcripción de la Vista en su Fondo del 27 de febrero de 2004, Apéndice I, págs. 222-224.
El caso de la Oficina 509 ofrece otro ejemplo. No hubo *779 oposición del doctor Serrano Muñoz la primera vez que se intentó cambiar el uso. Presentada la demanda de epígrafe, éste objetó otra propuesta de cambio, cuya realización no hubiera afectado el número de oficinas de cardiología. Su carta en oposición citó como fundamento la Escritura Matriz, el reglamento y “las representaciones que le fueron hechas al suscribiente y los otros compradores ...”. Apéndice I, pág. 883. Luego hizo referencia al litigio pendiente y añadió: “Le sugeriría que hasta tanto no se emita un dictamen en dicho pleito se atenga la [SEAM] a las oposiciones válidas como la del suscribiente, amparadas en ley y de acuerdo con la escritura Matriz, el Reglamento ... y ARPE.” íd. Durante la vista en su fondo, explicó el doctor Serrano Muñoz que su intención era preservar el status quo hasta tanto hubiese un dictamen judicial. Pero el tribunal no acogió esa interpretación de la referida carta y de su oposición. Éste determinó que los demandantes se opusieron “sin dar razón alguna”. Carta del Dr. Serrano Muñoz al Sr. Quiñoy de 16 de agosto de 2003, Apéndice I, pág. 865; Transcripción de la Vista en su Fondo del 27 de febrero de 2004, Apéndice I, págs. 236-239.
En fin, el juzgador de los hechos aquilató la prueba testifical, adjudicó la credibilidad de los testigos y entendió que el doctor Serrano Muñoz se opuso al cambio de uso de la Oficina 518 porque decidió objetar cualquier cambio de uso. Somos del criterio, ciertamente, que dicha prueba ad-mite otras interpretaciones. Pero no hallamos indicios de pasión, prejuicio, parcialidad, error manifiesto u otras circunstancias extraordinarias que nos permitan descartar la conclusión del foro primario. Por otra parte, la Mayoría descarta la adjudicación de credibilidad hecha por el foro sentenciador sin explicar en qué consiste “la pasión, perjuicio y parcialidad o error manifiesto” que justifique descartar la apreciación de la prueba efectuada por el juzgador. Discrepo de este curso de acción.
La prueba documental, a su vez, no suscita una convicción firme y definitiva de que las determinaciones del foro primario son incorrectas. Por ejemplo, el 6 de junio de *780 2002, el señor Quiñoy remitió una carta al doctor Serrano Muñoz proponiendo un cambio de uso para la Oficina 218. Los pormenores de la propuesta surgen de dicha misiva:
... las doctoras Idelisa Borges y María E. Ramos, cardiólogas, desean adquirir la oficina 218 para el uso de Cardiología. La oficina 218 est[á] dispuesta actualmente para el uso de Cirugía General y de la Mano. El uso actual sería eliminado. El Consejo de Titulares mediante carta circulada a ustedes el 12 de febrero de 2002, solicitó cambiar el uso de las oficinas 217 y 218 a uso común pero posterior a esta carta el 26 de abril de 2002 el Dr. Manuel Miranda nos escribí [ó] indicando que el Consejo de Titulares sólo desea comprar la 217 para destinarla a uso de área común. El uso original de la oficina 217 la cual se quiere cambiar a un uso de área común es de Cardiología. Estaríamos transfiriendo este uso de Cardiología de la oficina 217 a la oficina 218. Apéndice I, pág. 845.
El doctor Serrano Muñoz rechazó la propuesta mediante su carta de 12 de junio de 2002 al señor Quiñoy: “Me opongo al cambio de uso propuesto por usted para la oficina 218.” Id., pág. 846. Estos hechos, coetáneos con los de autos, sugieren que el doctor Serrano Muñoz se oponía a los cambios de uso que no implicaran una mega práctica de cardiología ni un aumento del número de tales oficinas. Ello corrobora en cierta medida la apreciación que hizo el juzgador de la prueba testifical. El contenido de esta comunicación fue soslayado en la opinión del Tribunal.
3. Lo antes expuesto, a mi juicio, nos impide intervenir con la determinación medular del Tribunal de Primera Instancia, a saber, que los demandantes recurridos se opusieron al cambio de uso de la Oficina 518 porque decidieron oponerse a cualquier cambio de uso. Ese fundamento, a su vez, es equivalente al simple ejercicio de una facultad de condominos. Por ello concluimos que la oposición al cambio de uso de la Oficina 518 reflejó un estado subjetivo contrario al principio general de la buena fe. Dadas las circunstancias particulares de este caso, basta con dicho estado anímico para configurar una infracción al referido principio, *781 (45) infracción que nos lleva a confirmar el acuerdo objetado.(46)
VII
En virtud de los fundamentos expuestos, disiento del curso de acción de la Mayoría y, en su lugar, dictaría sentencia revocando la Sentencia recurrida; en consecuencia, desestimaría la demanda de epígrafe y confirmaría la determinación del foro recurrido con respecto a la ausencia de temeridad.

 Los autos sugieren que dicha escritura fue enmendada mediante las escrituras números tres y cinco del mismo notario, otorgadas el 30 de mayo y 27 de septiembre de 2000, respectivamente, y que constan presentadas en los Asientos 104 y 132 del Libro Diario 983 de Río Piedras Norte, Sección Segunda del Registro de la Propiedad de San Juan. Véanse: escritura número 158 otorgada ante el notario Francisco M. Vázquez Santoni el 18 de abril de 2001, y escritura número 530 otorgada el 30 de septiembre de 2002 ante la notario Adela Surillo Gutiérrez, Apéndice de la Petición de Certiorari presentada por la SEAM (Apéndice I), págs. 768 y 795. No están en controversia estos asuntos.

 La Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico (SEAM) se reservó la titularidad del estacionamiento y de los pisos primero y tercero, éstos para ubicar establecimientos comerciales y de servicios médicohospitalario. Escritura Matriz, Apéndice I, pág. 616.

 Existe un Reglamento para la Administración del Condominio Torre del Auxilio Mutuo. No discutiremos sus disposiciones por entender que dejan de hacer una aportación significativa a nuestro análisis sobre el contenido de la Escritura Matriz.

 La cifra incluye una oficina dedicada a la cardiología pediátrica.

 Este párrafo se ampara principalmente en el testimonio incontrovertido del Dr. Manuel N. Miranda Ferrer, hasta entonces el único presidente de la Junta de Directores del Condominio. Este describió brevemente el procedimiento de consulta y añadió que “si había oposición no se vendía a esa especialidad”. Transcripción de la Vista en su Fondo de 1 de marzo de 2004, Apéndice I, pág. 424.

 La sentencia del foro primario determinó que la SEAM envió una carta a los titulares, suscrita por el Sr. Joaquín Quiñoy, “en la que anunciaba que se proponía venderle la oficina 518 a los codemandados doctores Lastra y Redondo Sentencia del Tribunal de Primera Instancia (Sentencia TPI), Apéndice I, pág. 959. El texto de la carta aclara que se mencionó a ambos doctores Lastra como posibles compradores.

 Sin embargo, ni el doctor Redondo Díaz ni su cónyuge, Cynthia Elizabeth Rivera, eran titulares de la Oficina 516. Sentencia TPI, Apéndice I, pág. 955.

 Surge de esta misiva que el señor Quiñoy se desempañaba como Presidente de la Comisión de Administración de la SEAM.

 La sentencia del foro primario determinó que, “[a] la fecha en que se ofreció por primera vez en venta la oficina 518, sólo existían 11 oficinas de cardiología, de las 15 enumeradas en la Escritura Matriz”. Sentencia TPI, Apéndice I, pág. 959. Nada sugiere que la cifra haya variado al efectuarse las referidas comunicaciones entre el señor Quiñoy y el doctor Serrano Muñoz. Por otro lado, los demandantes recurridos no han cuestionado que dicha cifra incluye una oficina dedicada a la cardiología pediátrica.

 Antes de someter el caso, los demandados solicitaron la desestimación de la *747 demanda al amparo de la Regla 39.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III. La cuestión se resolvió en su contra mediante un proceso que incluyó la intervención del Tribunal de Apelaciones y de este Foro, sin que se adjudicaran las controversias aquí presentadas.

 También se ordenó que los demandantes recurridos pagaran las costas de cada demandado, así como $1,000 por temeridad, a los demandados Lastra Hernández y Lastra Isemi conjuntamente.

 Específicamente, el tribunal concedió el injunction permanente solicitado, revocó la determinación de temeridad por haberse demandado a los doctores Lastra y devolvió el caso al Tribunal de Primera Instancia para que atendiera la cuestión de los daños.

 El Tribunal de Apelaciones no discutió la interpretación y aplicación de Soto Vázquez v. Vázquez Torres, 138 D.P.R. 282 (1995), que hizo el foro primario. Con respecto a la determinación de temeridad, el tribunal apelativo destacó los hechos siguientes: la carta mediante la cual se informó el cambio de uso mencionó como posibles compradores a los doctores Lastra Hernández y Lastra Iserni; el doctor Lastra Hernández participó activamente en la gestión del negocio, y los demandantes desconocían la titularidad de la Oficina 518.

 Explicó que dicha protección aplica cuando el tercero ha confiado en un registro inexacto. Al efectuarse los negocios jurídicos pertinentes, surgía del registro que la Oficina 518 estaba dedicada a la Otorrinolaringología. Por ende, el registro era exacto.

 Mediante el recurso CC-2005-888, comparece la SEAM y señala los errores siguientes:
“Primer Error. Cometió error el T de A al descartar la norma establecida en Parkside que permite reservas a favor del desarrollador para cambios de uso de áreas en los condominios, siempre que éstas consten en la escritura matriz y en todas las de compraventa.
“Segundo Error. El T de A comete error al sustituir sin base en derecho la apreciación de la prueba que hizo el TPI sobre el contenido claro de la reserva o escapatoria, habida cuenta de que las conclusiones de instancia se formularon sobre la base, no sólo del texto de la cláusula que autorizaba los cambios de usos sin necesidad de obtener el consentimiento unánime, sino a base de las propias alegaciones y de los testimonios ofrecidos por la parte demandante en el juicio y creídos por el juzgador de los hechos.
“Tercer Error. El T de A cometió error al descartar la apreciación de la prueba oral que hizo el TPI respecto a la intención que tuvieron las partes contratantes, sustituyendo así su propia apreciación sin que mediara pasión, prejuicio o parcialidad de parte del TPI y sin que la apreciación del foro de instancia representara un grave error o una injusticia.
“Cuarto error. Cometió error el T de A al negarle a los codemandados esposos Redondo-Rivera el carácter de terceros regístrales, protegidos en su adquisición de una oficina para cardiología.
“Quinto error. El T de A cometió error al no considerar que la oposición del demandante al cambio de uso de la oficina carecía de fundamento alguno y violentó la buena fe contractual.” Petición de certiorari, pág. 7.
Mediante el recurso CC-2005-904, comparecen los esposos Redondo-Rivera, quienes apuntan los errores siguientes:
Primer error: Erró el Tribunal de Apelaciones al concluir que los esposos Redondo no son terceros regístrales.
Segundo error: Erró el Tribunal de Apelaciones al sustituir la apreciación de la prueba que hizo el tribunal de instancia.
Mediante el recurso CC-2005-903, comparecen los doctores Lastra Hernández y Lastra Isemi, quienes señalan los errores siguientes:
“Primer error: ¿Puede un desarrollador de un inmueble sometido al régimen de propiedad horizontal hacer reserva en la escritura matriz para variar durante la fase de individualización y primeras ventas la especialidad de ciertas oficinas médicas?
“Segundo error: ¿Exige la cláusula 27 de la escritura matriz de la Torre Auxilio Mutuo el consentimiento unánime de los condominos para cambiar la especialidad de una oficina antes de la individualización y primera venta?
“Tercer error: ¿Son los esposos Redondo terceros regístrales? ¿A quién corresponde presentar prueba sobre mala fe, si en nuestro ordenamiento jurídico la buena fe se presume?
“Cuarto error: ¿Puede un tribunal apelativo sustituir la apreciación de la prueba y las determinaciones de hechos que hizo el TPI, en ausencia de error, pasión, prejuicio o parcialidad?
“Quinto error: ¿Act[ú]a con temeridad un demandante cuando incluye a un demandado en un pleito y lo mantiene hasta el juicio sin tener ni un ápice de prueba en *750 su contra?” Alegato de los peticionarios doctores Rafael Lastra Hernández y Jorge Lastra Inserni, pág. 12.

 La Cláusula Décimo Sexta establece que “cada titular” acatará las disposiciones de la Escritura Matriz, el Reglamento y los dictámenes del Consejo de Titulares. Apéndice I, pág. 731. Lo contrario justificará una acción de injunction, daños u otro remedio legal procedente. De otra parte, la Cláusula Décimo Octava establece que, “[s]in excepción alguna”, todo titular está obligado a cumplir con las disposiciones de la Escritura Matriz y del Reglamento. Añade que todo adquirente u ocupante de una unidad “acepta sin reservas las disposiciones recogidas en esta escritura, conllevando ello la ratificación de la misma en todas sus partes”. Apéndice I, págs. 731-732.

 Esta denominación es una abreviación común del título correcto “Ley de la Propiedad Horizontal”. Véase el Artículo 1 de la Ley Núm. 104 de 25 de junio de 1958 (Ley Núm. 104), recogido en el “Historial” de 31 L.P.R.A. sec. 1291 n.

 Véase el “Historial” de 31 L.P.R.A. see. 1291 n.

 La explicación ofrecida por la opinión mayoritaria sobre porqué aplica en este caso la Ley Núm. 104 es, a mi juicio, insatisfactoria. Véase esc. 15 de la opinión del Tribunal. La Mayoría lo que en efecto sostiene es que ya que el asunto referente al cambio de uso de las oficinas médicas surgía de la Escritura Matriz, lo allí dispuesto constituye un derecho adquirido. Tal interpretación tiene el efecto de eviscerar la disposición de retroactividad de la Ley Núm. 103 de 5 de abril de 2003 (Ley Núm. 103). De ordinario, toda controversia entre condómines habrá de referirse a alguna disposición de la escritura matriz del condominio en cuestión, por lo tanto, y siguiendo la lógica de la opinión del Tribunal, todo aquello que se disponga en una escritura matriz es un derecho adquirido. De facto, el Tribunal ha dejado sin efecto los Arts. 1 y 44 de la Ley Núm. 103 (31 L.P.R.A. sec. 1291 n.). Discrepo de tal conclusión.

 Específicamente, la Sec. 1 de la Ley Núm. 157 de 4 de junio de 1976 (Ley Núm. 157) añadió la siguiente disposición, que hasta la Ley Núm. 103 no sufrió enmiendas pertinentes al caso de autos: “La escritura que establezca el régimen de propiedad horizontal expresará clara y precisamente el uso a que será destinada toda área comprendida en el inmueble, y una vez fijado dicho uso sólo podrá ser variado mediante el consentimiento unánime de los titulares.” 1976 Leyes de Puerto Rico 484, 486.

 Específicamente, los Artículos 15 y 22 (31 L.P.R.A. sees. 1291 y 1292) figuraban en la Ley Núm. 157 y no han sufrido enmiendas pertinentes al caso de autos.

 También véase: Informe de la Comisión de lo Jurídico de la Cámara de Representantes sobre el P. de la C. 181, 9 de mayo de 1958, 10 Diario de Sesiones de la Asamblea Legislativa (Ordinaria), T. 3, pág. 1574 (1958); comentarios del Sr. Aponte en el hemiciclo de la Cámara de Representantes, 10 Diario de Sesiones de la Asamblea Legislativa (Ordinaria), T. 3, pág. 1649 (1958).

 A modo de ejemplo, la Exposición de Motivos de la Ley Núm. 157 señala:
“Existen intereses de índole pública que el Gobierno está obligado a atender con preferente consideración. Así deben prevenirse posibles abusos contra futuros adquirentes de apartamientos residenciales, que dificulten el logro de la política pública sobre utilización de terrenos del Estado Libre Asociado de Puerto Rico que se dirige a estimular que las familias puertorriqueñas residan en proyectos multi-familiares. Es necesario brindar igual protección a los ya titulares de apartamientos residenciales a fin de evitar que se perpetúen los abusos cometidos contra éstos en el pasado.” 1976 Leyes de Puerto Rico 486.
También véase el Informe Conjunto de las Comisiones de lo Jurídico Civil, Desarrollo Urbano y Vivienda y de Asuntos del Consumidor de la Cámara de Representantes sobre el P. de la C. 1862 de 21 de abril de 1976, 7ma Asamblea Legislativa, 4ta Sesión Ordinaria, págs. 2-3.

 Por ejemplo, véase el Artículo 38(d) (31 L.P.R.A. sec. 1291b(d)), y el Artículo 38-B, 31 L.P.R.A. sec. 1293b-2.

 Nótese que esa designación tiene que ser clara y precisa, mas no expresa. El uso “oficina médica”, por ejemplo, da a entender clara y precisamente que el apartamiento es comercial.

 Ciertamente, habíamos indicado en Cond. Prof. S.J. H. Centre v. P.R.F., Inc., 133 D.P.R. 488, 405 (Í993), que “[d]e surgir dudas en cuanto a la especificidad de los usos consignados en la Escritura Matriz, debemos atender a la voluntad de las partes al consignar éstos en la escritura y al adquirir los apartamientos en cuestión”. En el contexto de las servidumbres en equidad, compárense: Rodríguez et al. v. Gómez et al., 156 D.P.R. 307 (2002); Asoc. Vec. Urb. Huyke v. Bco. Santander, 157 D.P.R. 521 (2002). Resulta innecesario examinar este asunto, ya que la controversia de marras se refiere a la configuración de una restricción y una reserva, no a su especificidad.

 Véase, además: Consejo Tit. v. Galerías Ponceñas, Inc., 145 D.P.R. 315 (1998).

 También se discute, como cuestión de umbral, la capacidad del Consejo de Titulares, representado por la Junta de Directores y su Presidente, para instar la demanda.

 Sobre este particular, indicamos en Soto Vázquez v. Vázquez Torres, 138 D.P.R. 282, 296 (1995):
“... entendemos que no se da aquí la situación presente en Cond. Prof. S.J. H. Centre v. P.R.F., Inc., supra. En el caso de autos no existe una referencia directa al reglamento en la escritura similar a la existente en Cond. Prof. S.J. H. Centre v. P.R.F., Inc., supra. Es decir, en la escritura matriz del Centro no se incluyó una referencia directa a que la restricción específica de uso a cada uno de los apartamentos se fijarí[a] en el Reglamento. Por ende, ambas fuentes de obligaciones se mantuvieron separadas de manera que el reglamento no adquirió el valor obligacional de la escritura.
*764 “Más aún, en este caso, contrario a Cond. Prof. S.J. H. Centre v. P.R.F., Inc., supra, no se estableció una limitación general al uso de los locales en la escritura que sería limitado a un uso particular en el Reglamento. Por el contrario, el Reglamento no establece limitación particular alguna al uso comercial de los locales dispuesto en la escritura.”

 Dicho resumen nos permite apreciar, además, una dificultad con la interpretación de los peticionarios y del foro sentenciador. Sostienen éstos que la reserva del desarrollador para variar el uso asignado a los apartamientos en la escritura matriz es inválida sólo cuando se trata de un condominio comercial o profesional, donde los titulares tienen una garantía de exclusividad y la reserva no se limita al periodo inicial de ventas. Alegato de la parte peticionaria (SEAM), págs. 12-15. Empero, nuestra Opinión en Cond. Prof. S.J. H. Centre, supra, se refiere al elemento de exclusividad para precisar si hubo un cambio del uso establecido en la escritura matriz, habiéndose ya resuelto, sin dimes ni diretes, que era nula la reserva del desarrollador contenida en ella.

 El Artículo 2 de la Ley de Propiedad Horizontal, 31 L.P.R.A. see. 1291, indica que la escritura matriz debe fijar el destino y uso de cada apartamiento y que, una vez fijado dicho destino y uso, sólo podrá variarse mediante el consentimiento unánime de los titulares. Nótese como ese lenguaje admite dos interpretaciones. Una sostiene que el requisito específico de unanimidad aplica sólo cuando se trata de un uso cuya expresión en la escritura matriz es mandatoria. La otra interpretación sostiene que dicho requisito aplica a cualquier expresión de uso en la escritura matriz, es decir, que el segundo precepto del Artículo 2, supra, opera independientemente del primero.

 El requisito de dos tercios surge del Artículo 37 de la Ley de Condominios, 31 L.P.R.A. sec. 1293a. Nos abstenemos de expresar un criterio sobre la relación de ese precepto con otras normas de la misma ley y de su jurisprudencia, particularmente el inciso (d) del Artículo 38 antes citado C‘[p]or igual número de votos, podrá variarse el uso fijado a un área o a un local comercial o profesional, si así lo autoriza la escritura matriz”).

 Véanse, por ejemplo: Wright v. Cypress Shores Development Co., 413 So.2d 1115 (Ala. 1982); Flamingo Ranch Est., Inc. v. Sunshine Ranches H., Inc., 303 So.2d 665, 666 (Fla.App.1974). Son ilustrativas las siguientes expresiones del tribunal en Flamingo Ranch Est., Inc., ya que puntualizan una de las dificultades que entrañan las reservas:
“In a sense, there is an inherent inconsistency between an elaborate set of restrictive covenants designed to provide for a general scheme or plan of development (generally considered to be for the benefit of the respective grantees), and a clause therein whereby the grantor reserves to itself the power at any time in its sole discretion to change or even arbitrarily abandon any such general scheme or plan of development (a power which is solely for the benefit of the grantor). When such occurs, as it has in this case, rules of construction require that clauses which are apparently inconsistent with or repugnant to each other be given such an interpretation and construction as will reconcile them, if possible.
“In the instant case, this can be done by reading into the reservation clause a requirement of reasonableness .... We hold, therefore, that the clause in the Declaration of Restrictions, which reserves to the owner ‘the right to alter, amend, repeal or modify these restrictions at any time in its sole discretion’ is a valid clause so long as it is exercised in a reasonable manner as not to destroy the general scheme or plan of development.” (Cita omitida.) íd., pág. 666.

 Véanse, e.g.: Scott v. Sandestin Corp., 491 So.2d 334 (Fla. App. 1986); Queen’s Grant II v. Greenwood Development, 628 S.E.2d 902 (S.C. Ct. App. 2006).

 Esta casuística se ha discutido ampliamente en los estudios sobre las restricciones de uso incorporadas a los convenios restrictivos y a los condominios. Véanse, e.g.: Judicial Review of Condominium Rulemaking, 94 Harv. L. Rev. 647 (1981); C.B. Kress, Beyond Nahrstedt: Reviewing Restrictions Governing Life in a Property Owner Association, 42 U.C.L.A. L. Rev. 837 (1995); R.G. Natelson, Consent, Coercion, and “Reasonableness” in Private Law: The Special Case of the Property Owners Association, 51 Ohio State L.J. 41 (1990); D.R. Puterbaugh, The Reasonable Pet: An Examination of the Enforcement of Restrictions in California Common Interest Developments After Nahrstedt v. Lakeside Village Condominium Ass’n, Inc., 36 Santa Clara L. Rev. 793 (1996); P.A. Randolph, Jr., Changing the Rules: Should Courts Limit the Power of Common Interest Communities to Alter Unit Owners’ Privileges in the Face of Vested Expectations?, 38 Santa Clara L. Rev. 1081 (1998); L.A. Schiller, Limitations on the Enforceability of Condominium Rules, 22 Stetson L. Rev. 1133 (1993).

 Esta valoración distinta que han adoptado ciertas jurisdicciones estadounidenses se desprende, no sólo de los casos y los estudios citados anteriormente, sino de las normas endosadas en el Uniform, Condominium Act (1980) y el Uniform Common Interest Ownership Act (1994) (UCIOA) de la National Conference of Commissioners on Uniform State Laws (NCCUSL). 7 (Parte I) Uniform Laws Annotated 835 (2005). Según la Prefatory Note del UCIOA de 1994, “[b]y 1994, UCIOA [1982] had become the law in at least five States, while the Uniform Condominium Act, or substantially similar laws, exist in 21 States. A su vez, este modelo ha sido adoptado sustancialmente en dos estados (uno de los cuales haba adoptado el UCIOA de 1982). Vase Uniform Laws Annotated, Uniform Common Interest Ownership Act (1994), References & Annotations, West, 2005.

 Observamos que no está claro si dicho cambio de uso debe considerarse un acuerdo —válido o inválido— del Consejo de Titulares. Dado que las partes no han discutido este punto en sus alegatos, adjudicaremos el caso como si se tratara de tal acuerdo.

 Adviértase que no consideramos la posibilidad de otros remedios. También vale la pena subrayar que estamos examinando los acuerdos por unanimidad. Más delicada sería la pregunta de si el remedio indicado aplica a todos los acuerdos. Observamos, por ejemplo, que las decisiones sujetas al criterio de unanimidad son excepcionales, mientras que los acuerdos mayoritarios son relativamente frecuentes y existe, entonces, un mayor interés en su estabilidad.

 Existe un sinnúmero de normas ilustrativas de este principio. Por ejemplo, los derechos y las obligaciones del poseedor vencido varían sustancialmente según su buena o mala fe. Véase, e.g., los Artículos 296-300, 380-384, 386 y 393 del Código Civil, 31 L.P.R.A. sees. 1163-1167, 1466-1470, 1472 y 1479.

 “En situaciones como la de autos, en las que un titular posee una participación mayoritaria en los elementos comunes y, a su vez, pretende ejercer sus derechos como titular en una forma que constituye un claro abuso de derecho, la Junta de Directores está facultada para excluirlo de las votaciones que realice para obtener el consentimiento del Consejo de Titulares para instar procedimientos judiciales en su contra y para excluir su participación en los elementos comunes del edificio en el cómputo que se realiza para determinar la concurrencia de mayoría, según ésta es definida en la Ley de Propiedad Horizontal y en el Reglamento de Administración.” Consejo Tít. v. Calerías Ponceñas, Inc., supra, págs. 341-342.

 El Tribunal de Primera Instancia resolvió lo contrario por entender que la putativa reserva del párrafo 27(a), la cual examinamos a continuación, hace obscura la restricción de uso. Sentencia TPI, págs. 967-968. Este planteamiento suscita un círculo vicioso: cómo la restricción y la reserva tienen que ser claras, si tal reserva hace obscura tal restricción; también la restricción hará obscura la reserva. Por eso es que debemos examinar estas disposiciones independientes las unas de las otras.

 El párrafo 27(a) puede interpretarse razonablemente como que está dirigido a los futuros titulares y no al desarrollador. Tal análisis sostiene que la cláusula “en el futuro, luego de realizada la individualización y primera venta” (Apéndice I, pág. 735) pretende indicar que el párrafo se dirige exclusivamente a los nuevos titulares. Los peticionarios aducen, en cambio, que dicha cláusula tuvo el propósito de estable *775 cer cuándo y a quién aplicarán los usos especificados en el párrafo 5. Ninguna de estas interpretaciones es irrazonable; por ende, la supuesta reserva es ambigua.

 Dada la invalidez de esta reserva, su reproducción en la escritura de compraventa de los demandantes recurridos no puede configurar el consentimiento al cambio de uso a que se refiere Consejo Tit. C. Parkside v. MGIC Fin. Corp., 128 D.P.R. 538 (1991).

 Dado que nuestro análisis procede al amparo de la Ley de Propiedad Horizontal y del principio de la buena fe, nada resolvemos con respecto a si el referido Artículo 38-C(d) de la Ley de Condominios está exento de la presunción general de buena fe.

 Al resolver que se ha configurado una infracción del principio general de la buena fe, evaluamos la oposición de los demandantes recurridos con un criterio puramente subjetivo. Así procedemos porque los alegatos y los dictámenes bajo consideración han dejado de complicar el asunto. No debe entenderse que rechazaremos la posibilidad de acoger una metodología objetiva o ecléctica cuando la controversia se haya planteado adecuadamente.

 Este resultado hace innecesario que discutamos el planteamiento sobre la tercería registra!. En cuanto a la temeridad de los demandantes recurridos, compartimos el criterio del Tribunal de Apelaciones.